Scott DUFFY, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 87–160.

Supreme Court of Wyoming.

March 21, 1990.

Wyoming Public Defender Program, Leonard D. Munker, State Public Defender, and Martin J. McClain, Appellate Counsel, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., and Thomas E. Callison, Legal Intern, for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and GRANT, District Judge.

THOMAS, Justice.

The double jeopardy implications of separate sentences for aiding and abetting aggravated robbery and for conspiracy to commit burglary present the central issue in this case. Questions also are raised as to whether the sentences imposed, nine years, eleven months and twenty-nine days to ten years to run consecutively to twenty-four years, eleven months and twenty-nine days to twenty-five years, constitute a denial of due process because the appellant, Scott Duffy, is foreclosed from the right to earn statutory good time credits, essential for an early parole, and amount to a violation of the separation of powers doctrine as between the executive and judicial branches of government. A further question is posed as to whether Rule 15, W.R.Cr.P., was infringed because of the failure of the trial court to advise Duffy that it could impose consecutive sentences so that Duffy's plea of guilty was nullified. We hold that there is no violation of the constitutional prohibitions against double jeopardy in this instance, and the plea of guilty is not abrogated by the failure of the district court to advise Duffy of the possibility of consecutive sentences. The record does not demonstrate that the issues relating to the constitutionality of the sentences imposed are ripe for review at this time. The denial by the district court of Duffy's motion for correction of his sentences pursuant to Rule 36, W.R.Cr.P., is affirmed.

Duffy previously appealed his conviction. *Duffy v. State*, 730 P.2d 754 (Wyo.1986). In the initial appeal, counsel for Duffy attempted to urge error because of the trial court's refusal to merge for sentencing the offenses of aiding and abetting aggravated robbery and conspiring to commit burglary. Trial counsel had not presented that claim in the district court, however, and the appellate counsel had not included the issue in the brief. Consequently, in accordance with our usual appellate discipline, we declined to address that issue. We noted that Duffy was not foreclosed from presenting a claim that his sentences are illegal by a motion under Rule 36, W.R.Cr.P. With respect to issues that were properly presented, the court found no error in the judgment and sentence which had been imposed.

Duffy accepted the invitation to pursue relief under Rule 36, W.R.Cr.P., and did file a motion in the district court to correct an illegal sentence. The district court did not set the motion for hearing within sixty days, and it then was deemed denied in accordance with Rule 301, U.R.D.C. This appeal is from the automatic denial of that motion.

Duffy now presents the same issues that were urged to the district court. The State, as appellee, has accepted Duffy's statement of those issues, which is:

"1. Did the district court's imposition of consecutive sentences in the present case violate the double jeopardy clauses of the United States and Wyoming Constitutions?

"2. Does the sentence in the present case violate due process by denying Appellant a liberty interest, the right to good time?

"3. Does the sentence as structured by the District Court infringe upon the powers delegated to the parole board and thereby infringe upon the constitutionally mandated separation of powers?

"4. Whether the guilty plea was taken in violation of Rule 15, W.R.Cr.P., and whether the proceedings were void and the sentence illegal?"

In the initial proceedings, Duffy entered pleas of guilty to one count of aiding and abetting aggravated robbery in violation of §§ 6-1-201 and 6-2-401, W.S.1977 (June 1983 Repl.),[1] and to one count of conspiracy

---

1. Section 6-1-201, W.S.1977 (June 1983 Repl.) provides:

"(a) A person who knowingly aids or abets in the commission of a felony, or who counsels, encourages, hires, commands or procures a felony to be committed, is an accessory before the fact.

to commit burglary in violation of §§ 6-3-301, 6-1-303 and 6-1-304, W.S.1977 (June 1983 Repl.).[2] The district court ruled that there was a sufficient factual basis to accept Duffy's pleas of guilty to both charges. As we noted in *Duffy*, 730 P.2d 754, that factual basis was presented by a summation by the prosecutor of the available evidence to be used at trial and Duffy's admission of the accuracy of that recitation. The record demonstrated that Duffy, while he was incarcerated in Castle Rock, Colorado, had planned the robbery of his grandmother. He did this by telephone calls to two accomplices in Wyoming. Duffy explained to them how to gain entry into his grandmother's house and told them where they probably would find her valuables. The entire plan was that the two fellow conspirators would burglarize the grandmother's home, which was located in Fremont County, Wyoming, and they then would travel to Colorado to help Duffy escape from incarceration.

The two partners in crime went to the grandmother's home in accordance with the plan. One waited outside in a car while the other broke a window of the home to gain entry. The grandmother was awakened by the sound of the breaking glass, and she got up and went to the place where she had heard the noise. There, she discovered the burglar reaching through the broken window and holding a pistol in his hand. He ordered the grandmother to unlock the front door and, when she complied, he entered the house and demanded that she lead him to the safe where she kept her money. The grandmother took him into the bedroom where he removed a .38 caliber pistol from a nightstand. Duffy had told him of the location of that firearm. The robber then insisted that the grandmother show him her other valuables, and she complied with that demand. She took him throughout the house, showing him whatever valuable property he asked for. The robber collected the property in a pillowcase and returned to the waiting vehicle. Police officers successfully apprehended both principals before they could carry out the plan to help Duffy escape, and both of them confessed the robbery to the investigating officers, implicating Duffy in their statements.

On the basis of this factual showing, the district judge accepted the guilty plea. Duffy then was sentenced to a term of not less than twenty-four years, eleven months, twenty-nine days, nor more than twenty-five years, on the charge of being an accessory before the fact to aggravated robbery, and to a consecutive term of not less than nine years, eleven months, twenty-nine days, nor more than ten years, for conspir-

---

"(b) An accessory before the fact:

\* \* \* \* \* \*

"(iii) Upon conviction, is subject to the same punishment and penalties as are prescribed by law for the punishment of the principal."

Section 6-2-401, W.S.1977 (June 1983 Repl.), provides:

"(a) A person is guilty of robbery if in the course of committing a crime defined by W.S. 6-3-402 [larceny] he:

"(i) Inflicts bodily injury upon another; or

"(ii) Threatens another with or intentionally puts him in fear of immediate bodily injury.

\* \* \* \* \* \*

"(c) Aggravated robbery is a felony punishable by imprisonment for not less than five (5) years nor more than twenty-five (25) years if in the course of committing the crime of robbery the person:

\* \* \* \* \* \*

"(ii) Uses or exhibits a deadly weapon or a simulated deadly weapon."

**2.** Section 6-3-301, W.S.1977 (June 1983 Repl.), provides, in pertinent part:

"(a) A person is guilty of burglary if, without authority, he enters or remains in a building, occupied structure \* \* \* with intent to commit larceny or a felony therein.

"(b) Except as provided in subsection (c) of this section, burglary is a felony punishable by imprisonment for not more than ten (10) years, a fine of not more than fourteen thousand dollars ($14,000.00), or both."

Section 6-1-303, W.S.1977 (June 1983 Repl.), provides, in pertinent part:

"(a) A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to effect the objective of the agreement."

Section 6-1-304, W.S.1977 (June 1983 Repl.), provides, in pertinent part:

"The penalty for \* \* \* conspiracy is the same as the penalty for the most serious crime which is \* \* \* an object of the conspiracy \* \* \*."

acy to commit burglary. The court ordered that these sentences were to be served after Duffy was released from incarceration in Colorado.

Duffy's initial and primary contention is that the imposition of separate sentences for aiding and abetting aggravated robbery and for conspiracy to commit burglary placed him in jeopardy twice because the evidence relied upon to establish the factual basis for his plea of guilty on each of the charges was the same series of phone calls from Colorado to Wyoming. He contends that the plan developed from these phone calls resulted in a "single transaction", the burglary of his grandmother's house. In addressing claims of double jeopardy previously, this court consistently has held that each crime committed should be punished. We have agreed with the clear majority of jurisdictions that espouse a philosophy of crime and punishment and eschew the proposition that it is an acceptable result in our society for there to be crime without punishment.

 The rule that we have espoused for resolving the question of whether a defendant has been twice placed in jeopardy by virtue of multiple convictions and sentences is to look to the intention of the legislature with respect to whether the conduct should be punished as a single offense or as more than one. *Lauthern v. State,* 769 P.2d 350 (Wyo.1989); *Schultz v. State,* 751 P.2d 367 (Wyo.1988); *Birr v. State,* 744 P.2d 1117 (Wyo.1987). See *Ball v. United States,* 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985); *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

" 'Where consecutive sentences are imposed at a single criminal trial, the role of the [double jeopardy clause] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.' " *Birr,* 744 P.2d at 1119, quoting *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977).[3]

 In determining the question of legislative intent, we have examined statutory definitions, *Nowack v. State,* 774 P.2d 561 (Wyo.1989),[4] and we also have evaluated the other circumstance surrounding the crimes charged, whether they grow out of different transactions or different evidence is required to establish the separate offenses. *Nowack.*[5] If the conduct that es-

---

3. While the protection against double jeopardy has been described as designed, in part, to prevent multiple punishments for the same offense, the respective double jeopardy clauses of both the United States and the Wyoming Constitutions prevent multiple convictions for the same offense. *Ball v. United States,* 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985); *Dorador v. State,* 520 P.2d 230 (Wyo.1974). In neither instance, however, does the protection afforded by the double jeopardy clause inhibit multiple indictments for the same offense in a single proceeding. If the defendant is found guilty on charges represented by two counts that constitute a single offense, the court then must vacate one of the convictions so that the double jeopardy clause is not violated. *Ball; Jerskey v. State,* 546 P.2d 173 (Wyo.1976). Cf. *Vigil v. State,* 563 P.2d 1344 (Wyo.1977).

4. If it is clear that the legislature intended alternative means of committing a single offense, only one conviction can be attained even though different evidence would be required to demonstrate the alternative means of committing the offense. See *Jerskey v. State,* 546 P.2d 173 (Wyo.1976); *Dycus v. State,* 529 P.2d 979 (Wyo.1974); *Boyd v. State,* 528 P.2d 287 (Wyo.1974);

*Jackson v. State,* 522 P.2d 1356 (Wyo.1974), cert. denied 419 U.S. 1055, 95 S.Ct. 637, 42 L.Ed.2d 652 (1974); *Dorador v. State,* 520 P.2d 230 (1974); *Loddy v. State,* 502 P.2d 194 (Wyo.1972), cert. denied 414 U.S. 1134, 94 S.Ct. 877, 38 L.Ed.2d 760 (1974); *State v. Tobin,* 31 Wyo. 355, 226 P. 681 (1924). Accord, *Ex parte Snow,* 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658 (1887); *People v. Thomas,* 163 Ill.App.3d 670, 114 Ill. Dec. 746, 516 N.E.2d 901 (Ill.App.1987).

5. When it is clear that the legislature intended to punish each criminal act separately, because different evidence is essential to establish the separate charges, multiple convictions may be sustained. Eg., *Baum v. State,* 745 P.2d 877 (Wyo.1987); *Tuggle v. State,* 733 P.2d 610 (Wyo. 1987); *State v. Carter,* 714 P.2d 1217 (Wyo. 1986); *Hamill v. State,* 602 P.2d 1212 (Wyo. 1979); *Vigil v. State,* 563 P.2d 1344 (Wyo.1977). See also *Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958); *Ciucci v. State of Illinois,* 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed.2d 983, reh. denied 357 U.S. 924, 78 S.Ct. 1367, 2 L.Ed.2d 1375 (1958); *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *Ebeling v. Morgan,* 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915).

tablishes an element of the offense is repeated, we have held that separate crimes were committed even though the other evidence overlaps or is identical. *Baum v. State*, 745 P.2d 877 (Wyo.1987); *Tuggle v. State*, 733 P.2d 610 (Wyo.1987); *State v. Carter*, 714 P.2d 1217 (Wyo.1986); *Hamill v. State*, 602 P.2d 1212 (Wyo.1979).

> " ' * * * [I]f the offenses charged are separate and distinct either with respect to statutory definition, or, because * * * they grow out of different transactions and different evidence is needed to prove each, then the constitutional inhibition against double jeopardy is not applicable and, so long as the offenses charged are not factually inconsistent, a defendant may be found guilty and judgment of sentence thereon may be had as to each of the offenses charged.' " *Jackson v. State*, 522 P.2d 1356, 1359 (Wyo.1974), cert. den. 419 U.S. 1055, 95 S.Ct. 637, 42 L.Ed.2d 652 (1974), quoting *State v. Johnson*, 112 Ohio App. 124, 165 N.E.2d 814, 820 (1960).

See also *Goodman v. State*, 601 P.2d 178 (Wyo.1979); *Jerskey v. State*, 546 P.2d 173 (Wyo.1976). This rule was explained in this way in *Goodman*, 601 P.2d at 185:

> " * * * Two or more distinct offenses may emanate from the same transaction or act, and the rule that a person cannot be put twice in jeopardy for the same offense has no application where two separate and distinct crimes are committed by one and the same act. *People v. Hairston*, 1970, 46 Ill.2d 348, 263 N.E.2d 840, 847, cert. den. 402 U.S. 972, 91 S.Ct. 1658, 29 L.Ed.2d 136. Where two statutes are intended to suppress different evils, the acquittal or conviction on one will not prevent prosecution of the other. *Decker v. State*, 1971, 251 Ark. 28, 471 S.W.2d 343, 344; *State v. Ahuna*, 1970, 52 Haw. 321, 474 P.2d 704, 707 * * *."

With respect to those instances in which different statutes are involved, the question has been resolved by a determination that the legislature intended to define separate crimes, punishable separately. Conversely, when we have determined that the intention was to create only a single continuing offense or to describe alternative means of committing the same offense, the State may not structure multiple violations even though some separate evidence might support the several charges.

As noted in *Nowack*, we have approached this latter concept in *Kallas v. State*, 704 P.2d 693 (Wyo.1985), and later in *Bueno–Hernandez v. State*, 724 P.2d 1132 (Wyo.1986), cert. denied 480 U.S. 907, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). In *Kallas*, we relied upon *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), in holding that, when the same conduct violates more than one provision of the criminal code, the State may elect which violation to charge and pursue. This is the rule of *Batchelder*, with the clear implication flowing from it that an attempt to punish all of the options would result in a violation of the concept of double jeopardy.

As an example of repeated violations of the same statute, in *Hamill*, this court held that the legislature intended to protect the victim against each identifiable sexual penetration. Consequently, . even though a continuing course of conduct was involved, each sexual penetration demonstrated a separate crime. Following that case, in *Baum*, 745 P.2d at 882, we said:

> " * * * In sequence, appellant performed fellatio upon the victim and then made the victim reciprocate. It would not be reasonable for this court to determine that these two distinct acts of fellatio were only one criminal act. We hold that the trial court was proper in handing down two separate sentences for counts II and III for which appellant was convicted."

Baum contended that avoidance of double jeopardy demanded that the acts be separated by a substantial period of time or space. In response, the court stated:

> " ' "Where, * * * different criminal acts are at issue, supported by different factual evidence even though separated in time only by a few .seconds, one offense by definition cannot be 'included' in the other. The defendants can properly be punished for [all], under different, *or the same*, statutory provisons." ' " *Baum*,

745 P.2d at 882, quoting *State v. Molitoni*, Hawaii App., 711 P.2d 1303, 1306 (1985), quoting *State v. Pia*, 55 Hawaii 14, 19, 514 P.2d 580, 584–585 (1973) (emphasis in original).

■ In *Carter*, 714 P.2d 1217, a similar analysis was pursued. The court concluded that separate evidence supported the conviction for delivery of a controlled substance and the conviction for possession with intent to deliver a controlled substance, and the legislature intended that each violation be separately punished. Accord *State v. Bocian*, 226 Neb. 613, 413 N.W.2d 893 (1987). We there distinguished prior cases holding that a defendant could be convicted of only one offense if the same evidence, delivery of a controlled substance, was used to support a charge that the defendant possessed the controlled substance with intent to deliver it and then demonstrated the delivery. These cases can be categorized as those in which an alternative method of violating the statute was described by the legislature. See *Dycus v. State*, 529 P.2d 979 (Wyo.1974); *Jackson*, 522 P.2d 1356.[6]

■ In those instances in which the language and purpose of the statute indicate a legislative intent to structure a single offense with alternative methods specified by which the statute may be violated, any violation of the statute is a single offense. According to the general rule, this is the result even if the evidence demonstrates that the statute has been violated in both of the alternative ways and, in such an instance, only one conviction can be sustained.

" 'The rule is well settled that, where a statute makes either of two or more distinct acts, connected with the same general offense and subject to the same measure and kind of punishment, indict-

able separately and as distinct crimes, when each shall have been committed by different persons or at different times, they may, when committed by the same person at the same time, be coupled in one count, as constituting altogether but one offense. In such cases the several acts are considered as so many steps or stages in the same affair, and the offender may be indicted as for one combined act in violation of law; and proof of either of the acts mentioned in the statute and set forth in the indictment will sustain a conviction.'

"*Byrne v. State*, 12 Wis. 525; *Howard v. State*, 191 Ind. 232, 131 N.E. 403; *State v. Jackson*, 242 Mo. 410, 146 S.W. 1166; *Grayson v. State*, 92 Ark. 413, 123 S.W. 388, 19 *Ann.Cas.* 929; *Bradley v. State*, 20 Fla. 738; *Smith v. State*, 40 Fla. 204, 23 South. 854; *State v. McWilliams*, 7 Mo.App. 99; *The People v. Mackin*, 159 Ill.App. 125; *People v. Gossett*, 93 Cal. 641, 29 Pac. 246; *Bishop's New Criminal Proc.*, Vol. 1, § 436, and many cases cited in *Wharton's Crim. Proc.* (10th ed.) § 742." *State v. Tobin*, 31 Wyo. 355, 367–68, 226 P. 681, 685 (1924).

In that case, the court ruled that Tobin had been illegally sentenced because he had been convicted of both gambling and permitting gambling to be carried on in his house. The court held that one act necessarily was embraced in the other. Examination of the statutes and the authority cited in that opinion establishes that the court perceived the purpose of each statute to be directed toward the same evil, prohibiting gambling, and that both gambling and permitting gambling were intended to be alternative means of committing the same offense. See also §§ 3389 and 3391, W.C. S.1920; *Howard v. State*, 191 Ind. 232, 131

---

**6.** In some cases, language has been adopted indicating that merger is a separate claim from double jeopardy, but the rationale discloses that those decisions are premised on an implied conclusion of legislative intent. Merger for purposes of punishment occurs because of double jeopardy and, absent a constitutional restraint, the legislature is free to define offenses in its wisdom. It then becomes the duty of the court to sustain the legislative intent if that is constitu-

tionally possible. In those instances, a conclusion that the legislature intended separate punishments would have resulted in upholding that intent to punish separately, absent a clear constitutional violation. The decisions manifest a conclusion that the legislature did not intend to punish separately. *Boyd v. State*, 528 P.2d 287 (Wyo.1974), cert. denied 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102; *Dorador v. State*, 520 P.2d 230 (Wyo.1974).

N.E. 403 (1921).[7] The result was that, even though separate evidence demonstrated that the appellant had transgressed both provisions, he could be sentenced for only one violation, even though committed in the alternative.

The rationale of *Tobin* was invoked in *Loddy v. State*, 502 P.2d 194 (Wyo.1972), cert. denied 414 U.S. 1134, 94 S.Ct. 877, 38 L.Ed.2d 760 (1974), with the result that the defendant could be sentenced for only one offense when charged with malicious destruction of a telephone line and larceny of the same line. The reasoning is not precise, but the court did not hold that separate offenses merged into one simply because they were part of the same transaction. The court quoted extensively from 24 C.J.S. *Criminal Law* and, in the same section as that quoted, the following statement appears:

> "It is generally recognized that if accused enters a plea of guilty or is convicted on several counts of an indictment, and each count is for a separate and distinct offense, a separate sentence may be pronounced on each count, and the court may pronounce separate and distinct sentences which are cumulative, and are to run consecutively. This is true, even though the several offenses were committed in the course of a single transaction, or arose out of one general set of circumstances." 24 C.J.S. *Criminal Law* § 1567(3) at 424-28 (1961) (footnotes omitted).

*Loddy* is consistent with the conclusion that the legislature did not intend to punish separately the destruction of telephone line which was stolen, any more than it would intend to punish separately the breaking of a window which was accomplished in the course of a burglary.

In *Dorador*, 520 P.2d 230, and the cases which follow it, *Tobin* was relied upon to hold that the defendant could be convicted of only one offense when charged with delivery of a controlled substance and possession with intent to deliver the same substance. The alternative method of violation was articulated in the same statute in this way:

> " ' * * * [I]t is unlawful for any person to * * * deliver, or possess with intent to * * * deliver, a controlled substance.' " Section 35-347.31(a), W.S.1957, (Cum. Supp.1973), as quoted in *Dorador*, 520 P.2d at 231.

The court concluded that the legislature intended that a violation of the statute would result in only one conviction even though the language provided for alternative ways of committing the offense. The same evil was addressed. See also *Dycus*, 529 P.2d 979; *Boyd*, 528 P.2d 287; *Jackson*, 522 P.2d 1356. Compare *Carter*, 714 P.2d 1217.

In *Jerskey*, the rationale of *Tobin* was invoked with the result that Jerskey could not be convicted of both possession with intent to deliver a controlled substance and an attempt to deliver the same controlled substance. The evidence demonstrated that a package containing seven bricks of marijuana had been sent to Jerskey. The authorities intercepted the package, removed six of the bricks, and then permitted the package with the one remaining brick to be delivered to Jerskey. The court ruled that the same evidence supported both charges and that, had the police not inter-

---

7. In *Howard v. State*, 191 Ind. 232, 131 N.E. 403, 404-05 (1921), the Supreme Court of Indiana had addressed a similar statute and held:

"A statute often makes punishable the doing of one thing or another, sometimes thus specifying a considerable number of things. Then, by proper and ordinary construction a person who in one transaction does all, violates the statute but once, and incurs only one penalty. Yet he violates it equally by doing one of the things. Therefore the indictment on such a statute may allege, in a single count, that the defendant did as many of the forbidden things as the pleader chooses, employing the conjunction 'and' where the statute has 'or' and it will not be double, and it will be established at the trial by proof of any one of them. *Bishop's, New Criminal Procedure*, vol. 1, § 436.

"In the instant case we hold that the offense of permitting gambling is merged in the offense of keeping a gambling house, and that the allegation in the affidavit that the defendant 'unlawfully and knowingly permitted William Hall and others unknown to play at certain games for money and other articles of value' is surplusage and need not be proved to sustain a conviction."

vened, the package would have been delivered with all seven bricks. Consequently, separate charges of possession with intent to deliver and an attempt to violate the statute could not be sustained. In that instance, the product of the court's decision was that a lesser included offense, attempt, could not be punished separately from the actual offense. See *Brown*, 432 U.S. 161, 97 S.Ct. 2221. Only one sentence could be sustained.[8]

The rationale of the Wyoming cases is consistent with that of the Supreme Court of the United States concerning the question of whether separate evidence demonstrates separate offenses or a continuing single offense. The defendant in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), contended that two sequential drug transactions constituted only one offense. The Court there said at 301–02, 52 S.Ct. at 181:

" * * * The sales charged in the second and third counts, although made to the same person, were distinct and separate sales made at different times. It appears from the evidence that shortly after delivery of the drug which was the subject of the first sale, the purchaser paid for an additional quantity, which was delivered the next day. But the first sale had been consummated, and the payment for the additional drug, however closely following, was the initiation of a separate and distinct sale completed by its delivery.

"The contention on behalf of petitioner is that these two sales, having been made to the same purchaser and following each other with no substantial interval of time between the delivery of the drug in the first transaction and the payment for the second quantity sold, constitute a single continuing offense. The contention is unsound. The distinction between the transactions here involved and an offense continuous in its character, is well settled, as was pointed out by this

court in the case of *In re Snow*, 120 U.S. 274 [7 S.Ct. 556, 30 L.Ed. 658]. There it was held that the offense of cohabiting with more than one woman, created by the act of March 22, 1822, c. 47, 22 Stat. 31 [now 18 U.S.C.A. § 514], was a continuous offense, and was committed, in the sense of the statute, where there was a living or dwelling together as husband and wife. The court said [120 U.S. at 281, 286, 7 S.Ct. at 559, 562]:

" 'It is, inherently, a continuous offense, having duration; and not an offense consisting of an isolated act.

\* \* \* \* \* \*

" 'A distinction is laid down in adjudged cases and in textwriters between an offence continuous in its character, like the one at bar, and a case where the statute is aimed at an offence that can be committed *uno ictu.*'

"The Narcotic Act does not create the offense of engaging in the business of selling the forbidden drugs, but penalizes any sale made in the absence of either of the qualifying requirements set forth. Each of several successive sales constitutes a distinct offense, however closely they may follow each other."

The second issue addressed in *Blockburger* was whether separate offenses could be sustained because a single act of criminal conduct, the sale of narcotics, amounted to a violation of two distinct statutes. The court answered that question in the affirmative because, in that case, each of the statutes required proof of a fact that the other did not. Later, in *Ciucci v. State of Illinois*, 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed.2d 983, reh. denied 357 U.S. 924, 78 S.Ct. 1367, 2 L.Ed.2d 1375 (1958), the Supreme Court of the United States concluded that the murder of four people, in what apparently was a single criminal episode, created four separate offenses. The court held that it did not violate the double jeop-

---

**8.** The court in *Jerskey v. State*, 546 P.2d 173 (Wyo.1976), examined the evidence to conclude that identical evidence was relied upon to support a violation of the two statutory provisions, and the analysis is similar to that in *Birr v.*

*State*, 744 P.2d 1117 (Wyo.1987). Had the court pursued the problem under the same analysis articulated in *Birr*, the result would have been the same.

ardy clause to prosecute the four indictments in separate proceedings.

■ A dissenting opinion urged the proposition that the Fourteenth Amendment inhibits a state from subjecting a defendant to double jeopardy through multiple prosecutions when the charges arise out of a single criminal act, occurrence, episode, or transaction. In later cases, the Supreme Court has held that the same evidence may not be used to sustain multiple offenses in separate proceedings if one was a lesser included offense of the other. *Illinois v. Vitale,* 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); *Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); *Brown,* 432 U.S. 161, 97 S.Ct. 2221. The thrust of these later opinions is that a defendant cannot be subjected to multiple trials for those included and greater offenses even though the offenses are supported by different evidence. The rule of these cases is that no different result is obtained by trying a lesser included offense separately from the greater offense than would ensue if they were tried together. See *Nowack.*

Similarly, in *Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958), a single gunshot which caused injury to two police officers was not held to result in separate offenses because the court concluded that was not the intent of Congress. In that case, the Court carefully noted that if two shots had been fired each injuring a different officer, separate offenses could be sustained. See *Baum,* 745 P.2d 877; *Tuggle,* 733 P.2d 610; *Carter,* 714 P.2d 1217; *Hamill,* 602 P.2d 1212; *Vigil,* 563 P.2d 1344; *Ladner; Ciucci; Blockburger; Ebeling v. Morgan,* 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915).

■ When a court decides that the legislature intended a violation of two statutory provisions by a single act to be punished only once, double jeopardy results even though separate evidence might be used to support multiple offenses. *Schultz,* 751 P.2d 367; *Birr,* 744 P.2d 1117; *Garrett; Hunter.* This rule is quite like the rule relating to alternative means of violating the same statute or a conclusion

as to a continuing offense. If the legislature has expressed its intent in unambiguous language in the statute, the inquiry ends. *Schultz; Hunter.* The Wyoming legislature has not provided any definitive statutory guidance in this instance and, therefore, we resort to the usual rules of statutory construction to discern the legislative intent. Compare *Hunter; United States v. Harris,* 832 F.2d 88 (7th Cir.1987); *United States v. Springfield,* 829 F.2d 860 (9th Cir.1987); *State v. Frank,* 416 N.W.2d 744 (Minn.App.1987); *Nevada Department of Prisons v. Bowen,* 103 Nev. 477, 745 P.2d 697 (1987) (applying statutes expressing a clear legislative intent without resorting to rules of statutory construction).

In *Goodman v. State,* 573 P.2d 400 (Wyo.1977), our examination of the relevant statutes convinced the court that the elements of the charged offenses were different and that each statute was intended to address a separate evil. In that case, we reversed a conviction for first degree murder, but affirmed a conviction for killing an unborn child by assault and battery on a pregnant woman. The evidence showed that both of the convictions were premised upon the same conduct, a single gunshot wound to the mother. The case then was retried, and Goodman was found guilty of manslaughter of the mother. Upon appeal, we concluded that the legislature intended to impose separate punishments for each offense, and Goodman's argument that he had been twice placed in jeopardy for the same offense was not acceptable. *Goodman,* 601 P.2d 178.

In *Birr,* the court dealt with the question of whether a conviction of felony murder and the underlying felony, aggravated robbery, could be punished separately. To determine the question of legislative intent, the court looked to the language of each statute and applied the *Blockburger* test. The court then considered the purpose of each statute, identifying the gravamen of the offense and the evil intended to be addressed, and it also looked at the placement of the two statutes and the penalty provided to determine if both offenses contained separate penalty provisions. See

also *Lauthern; Schultz.* This inquiry is no different from that in any other instance in which the court is involved in statutory construction, see *Schultz,* except that the rule of lenity does require the resolution of any ambiguity in favor of the defendant. *Ladner.* Our approach is like that used in the federal system to discern congressional intent, although the relevant legislative history is more available in the federal context. In Wyoming, we have little legislative history to be of assistance. *Nowack; Lauthern.* See *Garrett; Ball; Hunter.*

■ Properly applied, the test of *Blockburger* examines the legislative definition without considering the facts. *Garrett; Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Iannelli v. United States,* 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293, n. 17, 43 L.Ed.2d 616 (1975).

> " * * * The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182.

This rule is simply a rule of statutory construction and should not be afforded preeminence over other rules. Furthermore, it should not be invoked when it leads to a conclusion that is inconsistent with legislative intent. *Schultz; Garrett.*[9]

■ Legislative intent first is expressed in the language of the statute, and it can be presumed that, when two statutes contain different elements, they were intended to address different offenses. *Ball; United States v. Stafford,* 831 F.2d 1479 (9th Cir.1987). The statutory language also will indicate if different evils were intended to be addressed. *Garrett.* Defining the of-

fenses in different statutes with separate penalties structures a presumption that the legislature intended separate punishments under each statute. *Birr; United States v. Woodward,* 469 U.S. 105, 105 S.Ct. 611, 83 L.Ed.2d 518 (1985).

■ When these principles are applied to this case, the conclusion must be that Duffy was not placed in double jeopardy by the two convictions. Any overt act by one of the other conspirators was sufficient to complete the crime of conspiracy to commit the burglary, see *Schultz; Burke v. State,* 746 P.2d 852 (Wyo.1987). The armed robbery occurred after the conspiracy violation had been committed. The separate convictions could be sustained on the basis of a finding that separate evidence supported each charge. Furthermore, the two statutes do not provide an alternative means of committing a single offense, and the prosecutor did not attempt to parse the conspiracy count into multiple conspiracies. Therefore, the rules espoused in *Tobin,* 226 P. 681, and *Snow,* 120 U.S. 274, 7 S.Ct. 556, do not apply. While, arguably, the convictions could be affirmed as different offenses supported by different evidence, see *Schultz,* the record does not justify a conclusion that they did not rest on the same evidence. The only evidence presented by the prosecutor to provide the factual basis for the pleas of guilty to the two offenses was the several phone calls from Duffy to his accomplices and the subsequent actions of the accomplices. This makes it necessary to determine whether the offenses are separate and distinct by virtue of their statutory definition. See *Goodman,* 601 P.2d 178.

In *Schultz,* we held that the legislature intended the offense of conspiracy to be a separate offense from the substantive crime that was the object of a conspiracy. In *Garcia v. State,* 774 P.2d 623 (Wyo. 1989), we held that felony murder and con-

---

**9.** In *Birr v. State,* 744 P.2d 1117 (Wyo.1987), we pointed out that application of the *Blockburger* test is not a reliable indication of legislative intent if the statute provides for violation in alternative ways. We cited the dissenting opinion of Justice Rehnquist in *Whalen v. United* *States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). In those instances, the manipulation of the language of the statutes to conform to the legislative intent can be avoided by focusing on the gravamen of the offense and the evil intended to be addressed. Cf. *Whalen; Birr.*

spiracy to commit aggravated robbery were intended by the legislature to be separate offenses. That same rationale pertains here. Each of the offenses with which Duffy was charged contain elements that the other does not, which satisfies the *Blockburger* test. The gravamen of conspiracy, and the evil intended to be addressed by the conspiracy statute is the agreement of criminal minds and the potential threat to the public from such agreements. *Percival v. State*, 745 P.2d 557 (Wyo.1987); *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168, reh. denied 434 U.S. 880, 98 S.Ct. 241, 54 L.Ed.2d 164 (1977); *Callanan v. United States*, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312, reh. denied 365 U.S. 825, 81 S.Ct. 687, 5 L.Ed.2d 703 (1961); *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489, reh. denied 329 U.S. 818, 67 S.Ct. 26, 91 L.Ed. 697 (1946).[10] The purpose of the aggravated robbery statute is to protect the person and the property of the individual. See *Birr*. Consequently, the gravamen of robbery is different from that of conspiracy. These statutes are set forth in separate sections of the criminal code, and each contains its independent penalty provision. These indicators all point to only one conclusion, that is, that the legislature intended these offenses to be punished as separate offenses. The result is that Duffy could be convicted of each of the charged offenses, and the court could impose consecutive sentences for those convictions without violating Duffy's constitutional protection against double jeopardy.

In his next argument, Duffy contends that the sentence imposed is illegal because the one-day difference between the minimum sentence and the maximum sentence in each instance does not permit him to accumulate good time against his maximum sentence. In support of this contention, Duffy asserts that, since the State granted him a right to earn good time, he has been invested with a protected liberty interest that cannot be denied without due process. This argument is premised on the rationale that, according to *Dorman v. State*, 665 P.2d 511 (Wyo.1983), any good time earned cannot be applied to reduce his minimum sentence.

In *Dorman*, we held that the legislature had created only a limited interest in good time, conditioned on the fact that any good time could not reduce a sentence below the minimum imposed by the court. That decision was based on the statutes and rules in effect at the time. The opinion quotes § 7–13–402(a), W.S.1977, which provided:

"The Board shall have the power to grant a parole * * * to any person imprisoned in any institution under sentence ordered by any district court of this state, other than a life sentence, and who shall have served the minimum term pronounced by the trial court * * *."

The court then noted the provision in § 1, Ch. IV of the Rules and Regulations of the Parole Board that:

" 'Section 1. *Definition*. Good time allowance is a reduction of the maximum sentence of an inmate as a result of his good, proper and helpful attitude, conduct and behavior in the institution and/or as a result of his adherence to the rules of the institution. *Good time allowance shall not be granted or awarded to an inmate so as to reduce the time served to less than the minimum sentence.* (Emphasis added.)' " *Dorman*, 665 P.2d at 513.

After Dorman's sentence was affirmed, the statutory provision and the rule relied upon in that decision both were modified. Section 7–13–402(a), W.S.1977 (June 1987 Repl.), provides:

"(a) The board may grant a parole to any person imprisoned in any institution under sentence, except a life sentence, ordered by any district court of this state, provided the person has served the minimum term pronounced by the trial court less good time, if any, granted under

**10.** This case demonstrates that the consensus of criminal minds often involves the planning of several substantive offenses. In this instance, the participants in the robbery also planned to travel to Colorado and to aid Duffy in making his escape from the institution in which he was incarcerated.

rules promulgated pursuant to W.S. 7–13–420."

The governor then adopted rules relating to good time allowance for inmates of the Wyoming State Penitentiary and the Wyoming Women's Center, in accordance with the authority granted by § 7–13–423, W.S. 1977 (1984 Cum.Supp.) (now set forth in § 7–13–420, W.S.1977 (June 1987 Repl.). The new rules provided with respect to the definition of good time allowance:

"Section 1. *Definitions.* (a) 'Good time allowance' is a reduction of the maximum sentence of an inmate in the amount of ten (10) days per month for each month served on a sentence as a result of the inmate's proper and helpful attitude, conduct and behavior in the institution and/or as the result of his/her adherence to the rules of the institution."

The restriction set forth in the prior definition of good time that "good time allowance shall not be granted or awarded to an inmate so as to reduce the time served to less than a minimum sentence" was deleted.

In light of the recent statutory amendments and modification of the rules, there now appears to be no restriction that prevents the reduction of Duffy's maximum sentence below his minimum sentence. Duffy has not argued that he is entitled to be released now if his good time earned is deducted from his maximum sentence. Neither has he presented any evidence that would indicate that he is presently being denied any good time to which he would be entitled under the statute and the rules. Under those circumstances, Duffy's argument does not present a cognizable claim that is ripe for our review. It will be appropriate for him to seek that relief when he can establish that the combination of good time added to the time served demonstrates that he has served the maximum term and is entitled to release. The record does not demonstrate any invasion of a constitutional liberty interest at this time that would justify a conclusion that Duffy's sentence is illegal.

In the third argument presented by Duffy, the claim is made that his sentence is illegal because it violates the separation of powers provision of the Wyoming Constitution. Duffy contends that the sentence restricts the authority of the Board of Parole to release him prior to the service of the minimum sentence imposed by the district court. The decision of the court in *Duffy,* 730 P.2d 754, and the preceding explanation of the adjustment in the statute and the rules resolves this claim.

■ As a final argument, Duffy asserts that his sentence is illegal because the guilty plea was accepted in violation of Rule 15, W.R.Cr.P. The essence of this claim is Duffy's argument that the trial judge, in order to comply with Rule 15, W.R.Cr.P., must advise him that consecutive sentences could be imposed. In pertinent part, Rule 15, W.R.Cr.P., states:

"(c) *Advice to defendant.*—Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, the following:

"(1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law; * * *."

The record demonstrates that the trial court advised Duffy of both the maximum and minimum sentence for each offense, and it shows that Duffy was aware of the maximum sentence that he faced. At the hearing in which the court accepted his pleas of guilty, the court stated:

"THE COURT: * * * Do you recall when you were in this Court at an earlier time in August, particularly, August 14, at which time you were advised of certain of your constitutional rights, and you pled 'not guilty?'

"MR. DUFFY: Yes, I do.

"THE COURT: And do you remember, I told you that under Count I of the Information, you could be imprisoned for not less than five or more than twenty-five years, and Count II, you could be imprisoned for not more than ten years or less than one year and fined $10,000?

"MR. DUFFY: Yes, I do understand."

It is clear that Duffy was advised of the maximum sentence for each offense prior to the acceptance of his guilty plea.

We have required strict compliance with the provisions of Rule 15, W.R.Cr.P., in order to demonstrate the validity of a plea of guilty and to avoid questions on post-conviction relief. *Gist v. State*, 768 P.2d 1054 (Wyo.1989). See *Keller v. State*, 723 P.2d 1244 (Wyo.1986); *Crawford v. State*, 701 P.2d 1150 (Wyo.1985). While we have required strict compliance with the provisions of Rule 15, W.R.Cr.P., we have not added to those requirements. See *Carson v. State*, 751 P.2d 1315 (Wyo.1988); *Percival*. There is no requirement in Rule 15 that the court advise a defendant of the possibility of the imposition of consecutive sentences. The rule only requires that the defendant be informed of the maximum sentence for each offense. The trial court complied with the rule, and Duffy's plea properly was accepted.

The product of our consideration of Duffy's claims is that he has not demonstrated an illegal sentence. Since he has not, the district court correctly dismissed his motion to correct and reduce his sentence, and the disposition by the trial court is affirmed.

URBIGKIT, Justice, dissenting.

## I. NATURE OF THE APPEAL

In 1984, Scott Lee Duffy, a young man imprisoned in Colorado for burglary, placed and received calls from an ex-girlfriend in Lander, Wyoming. These calls were used to plan the robbery of his widowed grandmother for funds to accomplish his escape in Colorado. At least three people participated in the July 4th break-in and robbery of Duffy's grandmother. Within twenty-four hours, the ex-girlfriend was talking to the police. In short order, all the criminal participants were behind bars.

As a result of the phone calls from Colorado to Wyoming, Duffy was charged with aiding and abetting aggravated robbery and conspiracy to commit burglary. He was extradited to Fremont County, and the initial trial judge, having been removed at Duffy's request, assigned the case to the judge who had tried the Hopkinson murder cases. *Hopkinson v. State*, 679 P.2d 1008 (Wyo.), *cert. denied* 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984); *Hopkinson v. State*, 664 P.2d 43 (Wyo.), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *Hopkinson v. State*, 632 P.2d 79, 166 (Wyo.1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), which also involved contention of a telephone call from incarceration to arrange a crime. The appointed public defender, whose office was 200 miles from Lander, was given, in best light, a difficult time by the successor judge.[1]

The trial judge sentenced Duffy to a maximum of twenty-five years and a minimum of twenty-four years, eleven months and twenty-nine days for aiding and abetting robbery. For conspiracy, Duffy was sentenced to a consecutive maximum term of ten years and a minimum of nine years, eleven months and twenty-nine days. The effect of this one day difference (actually two days with November sentencing date) was designed to foreclose options normally available to prison officials to control their crowded facility by providing the incentive of good time for cooperative behavior. *Duffy v. State*, 730 P.2d 754 (Wyo.1986) (*Duffy I*), Urbigkit, J., dissenting. The sentence was thirty-five years maximum and thirty-five years less four days minimum.

## II. ISSUES PRESENTED ABOUT WHICH I DISSENT

In this second appeal, I again dissent from the decision of this court for several reasons. First, this case allows prosecutors to duplicate charges and hoist upon a defendant more punishment for a single criminal act than was intended by Wyoming's legislature. Second, this case not only introduces "ripeness" to criminal prosecutions, which until now has been used to

---

**1.** Without belaboring the obvious in this record, the young female public defender was then subjected to trial court "antipathy" if not outright hostility. That subject will not be pursued as not now presented within this W.R.Cr.P. 36 second sequence appeal.

limit the availability of judicial review in administrative law cases, but the analysis offered considers only one prong to the two pronged ripeness test. Hardship on the individual, the second prong, is not even mentioned. Third, because our understanding of legislative intent determines whether or not the federal and state double jeopardy clauses have been violated, it seems prudent to openly reappraise our analytic capacity to discern legislative intent after Wyoming's legislature had to step in to correct what was a complete misunderstanding of legislative intent in *Duffy I*, 730 P.2d 754.[2]

## III. LITIGATIVE AND LEGISLATIVE HISTORY

My disaffinity remains unchanged regarding the Duffy sentence which was an effort by the trial court to change the Wyoming indeterminate sentencing system, including good time rights, into a determinate sentencing system. Some combination of my dissent in *Duffy I* and legislative recognition of the judicial misunderstanding in *Duffy I* of the clear intent of the law led to a change in the statute by Wyo.Sess. Laws ch. 157, § 3 (1987). W.S. 7–13–201 (emphasis added) provides:

> Except where a term of life is required by law, or as otherwise provided by W.S. 7–13–101, when a person is sentenced for the commission of a felony, the court

imposing the sentence shall not fix a definite term of imprisonment but shall establish a maximum and minimum term within the limits authorized for the statute violated. *The maximum term shall not be greater than the maximum provided by law for the statute violated, and the minimum term shall not be less than the minimum provided by law for the statute violated, nor greater than ninety percent (90%) of the maximum term imposed.*

See Wyo.Sess.Laws ch. 157, § 6 (1987), which states "[t]he amendment to W.S. 7–13–201 made by this act does not apply to any criminal case in which the sentencing court has imposed a sentence prior to the effective date of the act."

The legislature made the ninety percent differential requirement prospective only and avoided a legislative reversal of the Duffy sentence, the only case with such total aberration. That a judicial mistake was corrected prospectively by the legislature does not necessarily eliminate a constitutionally impermissible equal protection violation for the individual subject to the discriminatory result.[3]

Battles must inevitably end and the *Duffy I* issue of determinate sentencing is not presented in this narrowly confined W.R. Cr.P. 36 proceeding, except as to the basic underlying constitutional issue of equal protection.[4] *Duffy I* determined the validi-

---

**2.** The sentence Duffy received "is not 'indeterminate,' facially, definitionally or functionally, as that term of art is used * * *." *People ex rel. Harris v. Sullivan,* 74 N.Y.2d 305, 546 N.Y.S.2d 821, 545 N.E.2d 1209, 1211 (1989).

**3.** I do not find from *Dorman v. State,* 665 P.2d 511 (Wyo.1983) countervailing authority since the *Dorman* sentence of ten to twelve years would fit within an indeterminate sentencing system and is within the ninety percent rule subsequently enacted. *Duffy I* is the first case found as decided after the enactment of the current good time statute, W.S. 7–13–420. See *Duffy I,* 730 P.2d 754, Urbigkit, J., dissenting, appendix. The statute and accompanying rules in place when *Dorman* was decided were entirely different from the modernized good time provisions enacted after the extended legislative battle resolved by passage of Wyo. Sess. Laws ch. 49 (1984) (previously W.S. 7–13–423) and effectuated by the present rules.

**4.** Since my dissent in *Duffy I* was written, there seems to remain some misunderstanding of the practical effects of good time compared to special good time. Good time reduces the maximum sentence and provides benefit by earlier release without discretionary action by the parole board. Special good time lowers the minimum sentence only to give authority to the parole board as a matter of discretion for acceptance and consequent earlier release. At this date of writing, by last status report for July, August and September, 1989, 30.9 percent of the prisoners received full good time; 17.7 percent received partial good time; and 51.4 percent received no good time credit. There were 14.4 percent of the prisoners beyond minimum sentences and consequently received no special good time allocation since its award would make no difference with discretion vested in the parole board for release date until the maximum sentence was reached requiring service of the sentence flat time. Special good time pro-

ty for Duffy of the determinate sentences as a matter of statutory construction and left unresolved constitutional issues including merger of the offenses first raised in oral argument. That double jeopardy issue was side-stepped in *Duffy I* for consideration by a W.R.Cr.P. 36 proceeding and is now presented for the double jeopardy-merger-duplicity questions. Obviously, other issues may be followed by a post-conviction-relief petition if filed before December 11, 1990, including conduct of the trial court and clear question of ineffectiveness of counsel. *See Sword v. Shillinger,* 782 P.2d 1117 (Wyo.1989), Urbigkit, J., dissenting.[5]

## IV. RIPENESS

The claim that some presently presented arguments do not present cognizable claims that are *ripe* for our review seems inappropriate. We now apply an agency doctrine to criminal law review. We have before indicated "[t]he doctrine of ripeness is a judicially created limitation of the avail-

ability of judicial review in administrative law cases." *BHP Petroleum Co., Inc. v. State, Wyoming Tax Com'n.,* 766 P.2d 1162, 1164 (Wyo.1989). Even if we are about to do with ripeness what we have done to standing;[6] surely, if we are going to apply the ripeness doctrine beyond review of an agency decision, we should evaluate ripeness along the lines which *BHP Petroleum Co., Inc.* indicates is proper. The rationale presented by the majority presents only that prong which evaluates the fitness of an issue presented for judicial review. *See BHP Petroleum Co., Inc.,* 766 P.2d 1162. The second prong is necessary to evaluate ripeness by balancing the interests of judicial economy against the hardship of the party if judicial review is denied. While the majority presents no authority for the holding that Duffy's desire to know how his sentence will be computed is not yet *"ripe",* there is obviously a hardship on him which should be balanced even under the traditional "ripeness" doctrine.[7]

vides only potential parole release and no actual reduced sentence. Good time, conversely, reduces the maximum sentence and establishes the alternate release date if no parole rights are granted.

5. The only significant issue decided by the plurality decision of *Duffy I* (except trial court sentencing discretion) was immediately reversed by the legislative enactment to correct the judicial misunderstanding of the Wyoming indeterminate sentencing system. *Nowack v. State,* 774 P.2d 561 (Wyo.1989); *Lauthern v. State,* 769 P.2d 350 (Wyo.1989); *Birr v. State,* 744 P.2d 1117 (Wyo.1987); *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983); *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). If we ascribe to "legislative intent" some monolithic will, it is only fair that we explain "[w]hich historical people count as the legislators[.] How are their intentions to be discovered? When these intentions differ somewhat from one to another, how are they to be combined in the overall, composite institutional intention?" R. Dworkin, *Law's Empire* 315–16 (1986).

The utility of assuming legislative intent is not honored by these historical events. *Blockburger* does not actually address legislative intent with any logical persuasion; it only differentiates stated events as different. It announces that if something is different in some way, in some way it is different. The thesis of the case does not foresee whether the difference is a way that would be to the composite thoughtfulness of the

legislature found to be significant. Consequently, rather than funded in logic, it relates to an applied fiction for adjudicatory decision.

6. *See* Keiter, *An Essay on Wyoming Constitutional Interpretation,* XXI Land & Water L. Rev. 527, 533 (1986). Federal concerns for standing are based on the "case" or "controversy" requirement imposed by the federal constitution, *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The Wyoming constitution has no such "case" or "controversy" requirement. Yet this court may be adopting federal constitutional standing requirements without sufficient exploration, justification or explanation. *Armijo v. State,* 678 P.2d 864 (Wyo.1984); *Cremer v. State Bd. of Control,* 675 P.2d 250 (Wyo.1984); *Alberts v. State,* 642 P.2d 447 (Wyo.1982); *Washakie County School Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo.), *cert. denied* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980); *Budd v. Bishop,* 543 P.2d 368 (Wyo.1975). The term has a disturbing connotation. Ripeness conveys a concept of olfactory intervention. Does it have to smell to justify judicial examination?

7. To the extent that the trial court determinant sentencing finitely attacked the good time statute, W.S. 7–13–420, another more pervasive problem of ripeness and standing is created for any future test of validity since special good time—which becomes the issue in a determi-

Difficulty is also encountered in determining what, in addition to the adaptation of the decision in *Duffy I*, this court now decides in *Duffy II* is determinative and not dicta and what further issues are actually left for the future *Duffy III* post-conviction relief, habeas corpus or writ of certiorari petitions. In initial discussion, the majority states:

> We hold that there is no violation of the constitutional prohibitions against double jeopardy in this instance, and the plea of guilty is not abrogated by the failure of the district court to advise Duffy of the possibility of consecutive sentences. The record does not demonstrate that the issues relating to the constitutionality of the sentences imposed are ripe for review at this time. The denial by the district court of Duffy's motion for correction of his sentences pursuant to Rule 36, W.R.Cr.P., is affirmed.

The majority, again in regard to maximum and minimum sentences and the present *Duffy* ninety percent rule in good time, states:

> Duffy has not argued that he is entitled to be released now if his good time earned is deducted from his maximum sentence. Neither has he presented any evidence that would indicate that he is presently being denied any good time to which he would be entitled under the statute and the rules. Under those circumstances, Duffy's argument does not present a cognizable claim that is ripe for our review. It will be appropriate for him to seek that relief when he can establish that the combination of good time added to the time served demonstrates that he has served the maximum term and is entitled to release. The record does not demonstrate any invasion of a constitutional liberty interest at this time that would justify a conclusion that Duffy's sentence is illegal.

nant sentence—only invokes parole board discretion and not guaranteed release time and no mechanically computed release time will ever mature as a litigable issue. Consequently, a hypothetical or conjectural "opportunity" is the only subject which can actually be addressed in inquiry.

The majority discussion appears to misunderstand the real issue of *Duffy I* and its continued effect since the subsequent adoption of the *Duffy* amendment. Originally, the legislature adopted an indeterminate sentencing process which, in its nature, gave discretion to the executive probation department. What the Duffy sentence did was to remove the legislatively directed system of indeterminate sentencing and consequent involvement of the executive through parole opportunities of the convicted individual. Special good time does not create a parole date; it only affects how much parole discretion is available to the executive. Regular good time reduces that discretion spread, while special good time increases the spread by lowering the minimum sentence and, as a consequence, only provides a right for the individual to be considered for parole but not a right to be released.

First, it should be understood that requiring regular good time to those eligible is routine and special good time is highly discretionary. Most likely, special good time will only be accrued when good time is earned; but, unlike regular good time, cannot be withdrawn. In this case where Duffy was given the maximum sentence of thirty-five years for both minimum and maximum sentence, and assuming that he received maximum of both, e.g., good time—ten days per month and fifteen days special good time per month—he would be eligible for parole board review after an incarceration of seventeen years and nine months, and would be released after twenty-two years and four months flat time.[8]

The *Duffy* statute for the thirty-five year sentence as a ten percent differential would have required the minimum to be three and one half years less or not more than thirty-one years and six months, and would not have changed the flat time or maximum release date. It would have,

8. Obviously, this will not happen and Duffy may be facing a maximum flat time exposure of most, if not all, of the thirty-five years. *See* n. 10, *infra*. Attempted escape is not helpful to accruing either category of good time.

however, increased the period during which parole could have been considered from four years and seven months to seven years and ten months.

What all of this means to Duffy, age twenty-two at sentencing in 1986, is if he was released from Colorado confinement at the earliest date, December 1986, which likely occurred, he would, by the *Duffy* rule, possibly be eligible for parole in 2004 at age forty or released in 2009 at age forty-five. By application of the *Duffy* statute, he could be considered for parole about three years earlier in 2001 at age thirty-seven. Obviously, all of this is subject to the governor's power of commutation and the capacity of the state to continue to expand its prison system. At whatever age he might be released, after about twenty years in confinement, it should be expected he will continue to be a public charge in one way or another for the balance of his life. Most twenty-year firm sentences constitute a lifetime commitment for public responsibility unless surviving family can and will come to the rescue. All of this seems somewhat to escape the criteria of Wyo. Const. art. 1, § 15 which requires the "humane principles of reformation and prevention." The issue in *Duffy I* was not the incidental and illustrative function of good time, it was the essential character of Wyoming indeterminate sentencing as a legislative decision which was rescinded by judicial abrogation. *Cf. Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

In *Duffy I,* the issue of merger as an illegal sentence was furloughed to be considered under W.R.Cr.P. 36. With mandate issued in December 1986, Duffy followed on March 23, 1987 with a motion for corrected sentence and for sentence reduction pursuant to W.R.Cr.P. 36 contending that merger had occurred in the two offenses, that the sentence was impermissible under the separation of powers and the good time provisions of W.S. 7–13–423 (now W.S. 7–13–420), and that the sentence was illegal in that the defendant was not properly advised he could be subject to consecutive sentences totaling thirty-five years. A comprehensive brief in support of the motion was filed, but the relief requested was denied without hearing from which appeal is now presented as invited in *Duffy I.* When extracted from the considerable discussion of issues that are not now "ripe," the principal thrust of the present majority decision is to validate the dual charges of conspiracy to commit burglary and aiding and abetting aggravated robbery as the point of decision.[9]

## V. DOUBLE JEOPARDY, MULTIPLICITY, MERGER, AND LEGISLATIVE INTENT

A. Admittedly, the facts of this case add no sympathy for Duffy, but my concern is with the direction of Wyoming law. Apparently, Duffy had been involved with some sort of burglary incident with his grandmother's house before. When the July 4, 1984 crime occurred, the Lander police immediately started to check out anyone in town who had previous contact with him. Telephone calls charged to the mother of his ex-girlfriend immediately led to Michele Frey.

After Ms. Frey's confession, the two young male accomplices were in jail shortly thereafter. All contact with Duffy had been through Ms. Frey, a young mother, age twenty-one. She recruited Richard Sweaney and they jointly recruited Jeffery Warner, who acquired gloves and essentially "went along for the ride." Frey drove and Sweaney broke into the house with a stolen gun, threatened and handcuffed the terrified elderly grandmother, gathered up

**9.** Other issues noteworthy include consideration of inadequate advice of the possibility of concurrent sentences at sentencing as required by W.R.Cr.P. 15 and ineffectiveness of counsel. Either Duffy or his counsel were incompetent or they did not understand what they faced under the circumstances of the obvious bent of the trial court. Otherwise, they would never have pleaded out where the opportunity for consecutive sentences would have existed, as it did. Undoubtedly, Duffy did not expect his sentence would be more severe than that of the actual perpetrator, Richard Sweaney. With every opportunity available in trial and no benefit to the plea unless a bargain was reached, justification for what was done is de minimis.

the stolen goods, and returned to the car to divide their loot.

Frey, arrested on July 5th, was charged with one count of aiding and abetting aggravated robbery, W.S. 6–2–401(a)(ii), (c)(ii). On November 14, 1984, she entered a plea of guilty to the charge and, on January 22, 1985, received a sentence of fifteen to twenty years with credit for time in jail on the minimum. After a modification motion, the penal sentence was reduced to ten to twenty years which she presently serves in the Wyoming Women's Center.

Jeffery Warner, age nineteen, who obtained gloves for the offense, came back to the car before the burglary was committed. Also arrested within a day of the offense, he was likewise charged with aiding and abetting aggravated robbery. He pleaded guilty on August 14, 1984, and was sentenced on January 23, 1985 to a term of ten to fifteen years with credit on the minimum sentence. Subsequent modification also reduced his sentence to five to ten years.

Richard Sweaney, age nineteen, as the actual perpetrator of the crime, was also arrested and charged with armed robbery and kidnapping, W.S. 6–2–201(a)(ii). A merger argument was unsuccessfully made in defense and, on January 22, 1985, he changed his plea on both charges to guilty. On May 22, 1985, he was sentenced to ten to fifteen years on the aggravated robbery charge and fifteen to twenty years on the kidnapping charge with terms concurrent and credit awarded on the presentence confinement against the maximum sentences. A subsequent motion for sentence reduction was denied.

On July 6, 1984, in conjunction with the Frey, Sweaney and Warner complaints, a complaint was filed in county court against Duffy, charging him with aiding and abetting in the aggravated robbery and conspiracy with Frey and Sweaney to commit a burglary, an offense for which he was the only participant charged. Nothing happened to Duffy for nearly a year, when a detainer was served in Colorado where he remained in custody. Duffy requested dis-

position and was returned to Wyoming in June 1985, where he waived a preliminary hearing and entered pleas of innocent. A representative of the office of the public defender was appointed to represent him and, by his request, the case was reassigned resulting in designation of the other Ninth Judicial District Judge to hear the case.

On October 15, 1985, Duffy appeared in court to change his plea and was immediately sentenced. The sentence for aiding and abetting the aggravated robbery was twenty-four years, eleven months and twenty-nine days to twenty-five years (compared to the sentence of the principal perpetrator earlier given of ten to fifteen years and the co-actors Frey, fifteen to twenty years as reduced before the sentence to ten to twenty years, and Warner, ten to fifteen years as reduced to five to ten years). He was additionally sentenced to not less than nine years, eleven months and twenty-nine days and no more than ten years for conspiracy to commit burglary for which offense, either conspiracy of or burglary, none of the actual participants were ever charged. These sentences were consecutive and consecutive to the Colorado confinement which provided no credit for his pre-incarceration time as credit on the Wyoming sentence. Consequently, the sentences in total were: Sweaney, who separately committed this heinous offense and aggravated by kidnapping, received a maximum sentence of fifteen to twenty years with credit on the maximum; Frey, who organized and coordinated the crime, a sentence of ten to twenty years with credit on the minimum; Warner, as the willing participant but not involved in the entry of the house, five to ten years with credit on the minimum; and Duffy, for aiding, not only a heavier sentence than any of the participants on the aggravated robbery, but a separate charge involving burglary for which none of the participants were charged, a total sentence maximum of thirty-five years and a minimum of thirty-five years less four days with no presentence confinement credit.[10]

10. The anomalies were not to end there. The

young public defender, on October 31, 1987,

Double jeopardy and multiplicity [11] concepts in this improbable situation do invoke a one-of-a-kind case where commonly cited authority provides little relevance. But the basic result of creating two crimes out of one conduct, *Pena v. State*, 780 P.2d 316 (Wyo.1989), invades the entire philosophy upon which protection against double jeopardy was initially developed and subsequently invested into not only the constitution of the United States but also most states, including Wyoming. Ingenuity of prosecutors to multiply charges is documented by this case. We have a single transaction in which Duffy participated by telephone calls to his ex-girlfriend to rob his grandmother to acquire funds for his use to escape in Colorado. It is out of that transaction that potential separate trial charges raise the following double jeopardy questions:

1. Conspiracy to commit and aiding and abetting in the commission;
2. Conspiracy to commit and commission of the principal offense;
3. Aiding and abetting one and conspiracy to commit the other (the charge actually made);
4. Aiding and abetting both; and
5. Conspiracy to commit both.

married her client, this appellant. Thereafter, in August 1988, according to a newspaper article included within the file material, during an overnight conjugal visit with his wife, Duffy climbed the fence from the prison grounds only to be captured the same day with a sprained ankle and cut hand. No charges were apparently filed for the escape, but the incident will no doubt have a direct effect on attainment of both good time and special good time benefits for sentence reduction.

Whether or not related to the marriage of a felon to his public defender, this case is pervaded by questions of ineffectiveness of initial trial counsel and subsequent appellate counsel, including peremptory challenge of the initial judge, guilty plea for two offenses before the successor judge and later confined scope of initial appeal. *See Murray v. State*, 776 P.2d 206 (Wyo.1989); *Kallas v. State*, 776 P.2d 198 (Wyo. 1989); and *Amin v. State*, 774 P.2d 597 (Wyo. 1989). To be compared are *Whitney v. State*, 745 P.2d 902 (Wyo.1987) and *Price v. State*, 716 P.2d 324 (Wyo.1986) followed by *Cutbirth v. State*, 751 P.2d 1257 (Wyo.1988) with *Duffy I* and what will now be *Duffy II.*

**11.** Multiplicity and double jeopardy have been differently defined, although in usage it is fre-

Without including the actual commission of the offense in the computation, an interesting number of combinations as chargeable offenses can be extrapolated as well as the contention that at least four separate sentence-prone offenses could be charged for the one activity, e.g., aiding and abetting and conspiracy to commit burglary and aiding and abetting and conspiracy to commit armed robbery. Since the occurrence was further complicated by the principal perpetrator's plea of guilty to kidnapping, a further aiding and abetting charge to that sequential occurrence could also be piled on.

B. My principal objection to the majority decision is in its inattention to the substantive characteristics of duplicity, double jeopardy and merger. I do not agree with this court's present decision and continue to find improvident the direction previously initiated by *State v. Carter*, 714 P.2d 1217 (Wyo.1986) and continued by the lesser included offense division of *Birr v. State*, 744 P.2d 1117 (Wyo.1987).[12] My concern comes from present discussion of this majority in attempting to reconcile the transactional test brought to bear by Justice Blume in *State v. Tobin*, 31 Wyo. 355, 226 P. 681 (1924), which continued until abrupt-

quently hard to tell the difference in practical application. Multiplicity is a practice of charging the commission of an offense in several counts. *United States v. Swaim*, 757 F.2d 1530 (5th Cir.), *cert. denied* 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985); *State v. Smith*, 245 Kan. 381, 781 P.2d 666 (1989). It is stated that the Federal Rules of Criminal Procedure were drafted to discourage this practice. *United States v. Allied Chemical Corp.*, 420 F.Supp. 122 (E.D.Va. 1976). See F.R.Cr.P. 7(c) and notes of advisory committee. *See also* F.R.Cr.P. 9.

Double jeopardy, as a constitutional protection, serves both to deny dual conviction and successive prosecution for essentially the same crime. *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). A claim of double jeopardy is fundamental. *Ashinsky v. State*, 780 P.2d 201 (Okl.Cr.1989); Comment, *Twice in Jeopardy*, 75 Yale L.J. 262 (1965). "Merger" again differs in concept as addressing the major and minor crime involving the lesser included offense concept. Black's Law Dictionary 891–92 (5th ed. 1979).

**12.** This is, however, a *Birr* case and not confined to a *Blockburger–Carter* intent interpretation analysis.

ly terminated by decision of this court in *Carter*, 714 P.2d 1217 to change to the *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) presumed legislative intent test of separate evidence for each incident.[13] Since *Carter*, 714 P.2d 1217, we have had a parade of complications in multiplied penalties for a single transaction. I have come to accept the fact that Wyoming, like most but surely not all states, has adopted this improvident pathway, *see Schultz v. State*, 751 P.2d 367 (Wyo.1988), but still reject the character of conduct to which dual criminal assessments are only wordsmanship to escape the limitations provided by both the Wyoming and United States Constitutions. *People v. White*, 41 Mich.App. 370, 200 N.W.2d 326 (1972), *aff'd*, 390 Mich. 245, 212 N.W.2d 222 (1973); *Ashinsky v. State*, 780 P.2d 201 (Okl.Cr.1989).[14]

In considering the morass of cases involving merger, multiplicity and double

**13.** Clearly, *Blockburger* as well as Wharton's Rule, *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *People v. Carter*, 415 Mich. 558, 330 N.W.2d 314 (1982), which also tests multiplicity for conspiracy cases, are not double jeopardy concepts. Both address interpretation of legislative intent. *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764, *reh'g denied* 473 U.S. 927, 106 S.Ct. 20, 87 L.Ed.2d 698 (1985); *Beam v. Foltz*, 832 F.2d 1401 (6th Cir.1987), *cert. denied* 485 U.S. 980, 108 S.Ct. 1278, 99 L.Ed.2d 489 (1988).

The separate evidence rule has an extended history. *See Morey v. Com.*, 108 Mass. (12 Browne) 433 (1871). It is how the interpretative tool is applied that double jeopardy in result is now invaded. Double jeopardy itself has a history that can be traced to Henry II in 1176. 1 F. Pollock & F. Maitland, *The History of English Law* 444–57 (2nd ed. 1898). See also *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) and *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).

**14.** The author in Comment, *supra n. 11,* 75 Yale L.J. at 299–300 (emphasis added and footnotes omitted) states:

The urge to punish cumulatively is not of recent birth. In 1305, when Edward I sat upon the throne of England, the notorious traitors William Wallace and David of Wales were punished. *Wallace was "drawn for treason, hanged for robbery and homicide and disembowelled for sacrilege, beheaded as an outlaw and quartered for divers depredations."* David enjoyed a similar fate.

Since the fourteenth century, courts have exercised considerably more self-restraint. *See* 2 F. Pollock & F. Maitland, *supra, n. 13.*

The double jeopardy protection is under constant attack in directed extension of prosecutorial opportunity and extended judicial discretion. I am disinclined to withdraw from supporting maintenance of the double jeopardy barrier. I will also not accept the author's comment that "today the rule is more commonly revered than understood" or his contention for my application that the "sea of exceptions" "are the characteristic signs of Doctrinal senility." Comment, *supra n. 11,* 75 Yale L.J. at 263–64.

I do not ignore the attribution of waiver most currently addressed for double jeopardy under the United States Constitution in *United States v. Broce*, 488 U.S. 563, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). The issue was addressed in initial appeal, albeit by jurisdictional reference to this proceeding. I find that the *Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) and *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) exceptions to the waiver rule can be applied. Additionally, at least for this present consideration, I am completely disinclined to apply the *Broce* double jeopardy waiver by plea adaptation to a constitutional protection provided in *the Wyoming Constitution.* In that context for our state constitution, I would follow what Justice Blackmun said in dissent:

A guilty plea, for all its practical importance in the day-to-day administration of justice, does not bestow on the Government any power to prosecute that it otherwise lacks.

*Broce*, 488 U.S. at ——, 109 S.Ct. at 768, 102 L.Ed.2d at 945. See also a quotation from *Short v. United States*, 91 F.2d 614, 624 (4th Cir.1937) as repeated by Justice Blackmun in *Broce*, 488 U.S. at ——, 109 S.Ct. at 769, 102 L.Ed.2d at 947:

"The constitutional provision against double jeopardy is a matter of substance and may not be thus nullified by the mere forms of criminal pleading."

Justice Blackmun further related:

" 'The Double Jeopardy Clause is not such a fragile guarantee that ... its limitations [can be avoided] by the simple expedient of dividing a single crime into a series of temporal or spatial units.' " *Sanabria v United States*, 437 US [54], at 72, 57 L Ed 2d 43, 98 S Ct 2170 [at 2183], quoting *Brown v Ohio*, 432 US 161, 169, 53 L Ed 2d 187, 97 S Ct 2221 [2227] (1977). As we pointed out in *Braverman v United States*, 317 US 49, 52, 87 L Ed 23, 63 S Ct 99 [101] (1942), there may be a "single continuing agreement to commit several offenses." On the face of the two indictments, there was clear support for a claim that prosecuting the second indictment was barred by double jeopardy.

*Broce*, 488 U.S. at ——, 109 S.Ct. at 771, 102 L.Ed.2d at 949.

Essentially, however, we do not have a *Broce* case since the facts and the events are estab-

jeopardy infected by multiplied criminal statutes and nurtured by an accelerating habit of multiple charges, first reference should be made to the fundamental American case of *Ex parte Lange,* 18 Wall. 163, 85 U.S. 163, 171, 21 L.Ed. 872 (1873) (quoting *The Commonwealth v. Olds,* 5 Littell 137), where that court, after a comprehensive review of the history and essence of the constitutional protection against double jeopardy, repeated:

"[T]hat every person acquainted with the history of governments must know that state trials have been employed as a formidable engine in the hands of a dominant administration.... To prevent this mischief the ancient common law, and well as Magna Charta itself, provided that one acquittal or conviction should satisfy the law; or, in other words, that the accused should always have the right secured to him of availing himself of the pleas of *autrefois acquit* and *autrefois convict.* To perpetuate this wise rule, so favorable and necessary to the liberty of the citizen in a government like ours, so frequently subject to changes in popular feeling and sentiment, was the design of introducing into our Constitution the clause in question."

That court then concluded:

There is no more sacred duty of a court than, in a case properly before it, to maintain unimpaired those securities for the personal rights of the individual which have received for ages the sanction of the jurist and the statesman; and in such cases no narrow or illiberal construction should be given to the words of the fundamental law in which they are embodied.

*Ex parte Lange,* 85 U.S. at 178, 21 L.Ed. 872.

Additionally, by oath and responsibility, this court cannot abstain from the jurisdiction which has been conferred to sustain the rights guaranteed not only by the United States Constitution, but more immediately by the Wyoming Constitution. As Justice Scalia stated for the United States Supreme Court in *New Orleans Public Service, Inc. v. Council of City of New Orleans,* —— U.S. ——, 109 S.Ct. 2506, 2512, 105 L.Ed.2d 298 (1989) (quoting *Cohens v. Virginia,* 19 U.S. 264, 6 Wheat. 264, 404, 5 L.Ed. 257 (1821)), " '[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.' "

C. There are a multitude of cases which are quite similar in factual circumstances which involve burglary and robbery. My uneasiness about this case is the observable ineffectiveness of counsel in relinquishing the armor of double jeopardy by the entry of a plea to these duplicated charges.[15] Axiomatic as a result of this decision, aiding and abetting can similarly accommodate the separate criminal offense of conspiracy, since aiding and abetting is in essence conspiratorial in conduct. This majority adds gloss but no real substance by taking one aspect of the transaction and attaching conspiracy to it without any particular rhyme or reason and then separately applies aiding and abetting to another aspect of the same criminal event. This is only done to create two crimes out of one. This observation was also recognized by the Vermont court in *State v. Perry,* 563 A.2d 1007, 1010 (Vt.1989):

"[T]he same act may constitute two separate crimes, and, if they are not so related that one of them is a constituent part, or necessary element, in the other, so that both are in fact one transaction, a prosecution and conviction may be had for each offense." *State v. Parker,* 123 Vt. 369, 371, 189 A.2d 540, 541–42 (1963).

*See also State v. White,* 322 N.C. 506, 369 S.E.2d 813 (1988), where robbery and larceny could not be divided to create two sepa-

---

lished in this record and re-reference for fact finding is not required. See, for reference, Stuntz, *Waiving Rights in Criminal Procedure,* 75 Va.L.Rev. 761 (1989).

**15.** It is no wonder this country has by all degrees a greater percentage of penal incarcerations than any other civilized nation when we take one act to create two offenses for dual incarceration responsibility. This country surely has an adequate number of miscreants as well as the number of unsolved or inadequately prosecuted crimes that it does not need to scratch to find two crimes for the same offense.

rately punishable crimes and *Vines v. United States*, 540 A.2d 1107 (D.C.App. 1988), kidnapping and armed robbery with confinement momentary and co-existence.

This appeal does not require extricating conspiracy from commission of the principal offense for merger or double jeopardy assessment. We have here two inchoate or agglutinative offenses for which the identical evidence was used. Conspiracy and aiding and abetting under Wyoming law are inchoate offenses, drawing criminal responsibility from the categorized offense. No individual can be guilty of a crime of conspiracy unless it relates to the intended commission of a crime and aiding and abetting only denominates a participant for responsibility when the criminal act is committed. Aiding and abetting and conspiracy as applied here are separate characterizations of the same conduct directed to assess separate responsibility for the same criminal misconduct. The penalties in both cases are the same as the designated offense. *See* W.S. 6-1-304 and 6-1-201.

Within the mass of cases,[16] authority can be found for every position taken except no case like this one is found invoking conspiracy to commit the burglary and aiding and abetting the more serious aggravated robbery which was a product of the burglary. Using the methodology of this occurrence, we reach a stage of ingenuity of prosecution until division of cases into segments become almost limitless and particularly so if magnification by the inchoate offenses of conspiracy and aiding and abetting are introduced. The broad issue is fundamental

to double jeopardy—conviction and dual sentencing for one criminal event. The more specific question here invokes the relationship of burglary to the offense of aggravated robbery as those separate statutes are impacted by the inchoate offenses of conspiracy and aiding and abetting. The basic issue that should have been resolved is whether the burglary, which progressed into the robbery, can be separately charged or should the maximum sentence for Duffy have been limited to the one offense maximum of twenty-five years.

A magnificent play on words defined in legislative intent is invoked in these thousands of cases. I dissent because what we do is conceptually vacuous and logically indefensible. Burglary in this case involved illegal entry with intent to commit a felony. The felony committed in this case was aggravated robbery. It would have been exactly the same in this case if Duffy had been charged with the offense he committed, aiding and abetting aggravated burglary. However, by charging down to burglary, the prosecutor was dividing up what was otherwise a unitary offense involving the same evidence of what occurred and consequently achieving consecutive sentences exceeding statutory maximums as a penalty. This is what our forefathers feared when they constitutionally provided prohibitions against double jeopardy as being twice sentenced for one offense or twice tried for the same offense. Comment, *Twice in Jeopardy*, 75 Yale L.J. 262 (1965).[17]

---

16. A double jeopardy search through Westlaw in all states elicits 14,346 case entries.

17. We have a case presently pending in this court where the defense to a civil action against a prosecutor and probation officer, when they are charged with wrongful incarceration of an individual by perjured statement, is immunity. The observation made for denial of civil relief is that criminal prosecution may be the more appropriate answer. It is interesting to apply the *Duffy II* principle of amoeba division to multiply charges and determine all possible criminal complaints that could be made against the prosecutor where the principal offenses most appropriately are W.S. 6-5-107, official misconduct; W.S. 6-5-202, accessory after the fact; and W.S. 6-5-301, perjury. Additionally, at least theo-

retically, charges could be made of conspiracy to commit each offense and aiding and abetting the other participants in the commission of the offense. Consequently, the maximum term that might be faced by those public officials for a false arrest by perjured statement could total twenty-seven years confinement and a $39,000 fine. *Cf. Howard v. State*, 762 P.2d 28 (Wyo. 1988). This would not include the opportunities for federal prosecution when a state official commits perjury and uses the mail for improper purpose or possibly what the more ingenious prosecutor might find if they chose as charges to file against the prosecutor for claimed criminal misconduct. Gamesmanship of multiplied charges is a genie which may not be easily rebottled.

D. What Duffy *does not present* as issues are separate charges of conspiracy and the principal offense. With the exception of a few jurisdictions where conspiracy may still be considered a lesser included offense, the general and accepted rule, including justification in the idea of sequential events as separable crimes, is that separate charges and separate sentences can be achieved by the dichotomy of conspiracy to commit and commission of the principal offense. *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Finazzo*, 704 F.2d 300 (6th Cir.), *cert. denied* 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983); *State v. Johns*, 184 Conn. 369, 439 A.2d 1049 (1981); *People v. Carter*, 415 Mich. 558, 330 N.W.2d 314 (1982); *State v. Carey*, 285 N.C. 509, 206 S.E.2d 222 (1974). Compare, however, *Garcia v. State*, 774 P.2d 623 (Wyo.1989) and *Schultz*, 751 P.2d 367 with *Birr*, 744 P.2d 1117, where in the latter case, the separately chargeable conspiracy was not charged instead of the lesser included offense as a constituent of the felony murder.

Aiding and abetting as an inchoate offense with identical exposure for criminal punishment as the principal offense can also be filed separately from conspiracy without creating a double jeopardy constitutional violation. This principle follows from the nature of conspiracy being severable from the principal offense since aiding and abetting is identically treated as a principal offense. *United States v. Herbert*, 698 F.2d 981 (9th Cir.), *cert. denied* 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983); *United States v. Valencia*, 492 F.2d 1071 (9th Cir.1974); *State v. Spearin*, 477 A.2d 1147 (Me.1984); *Carter*, 330 N.W.2d 314; *People v. Hamp*, 110 Mich.App. 92, 312 N.W.2d 175 (1981). *Cf. United States v. Mourad*, 729 F.2d 195 (2nd Cir.), *cert. denied* 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984), *cert. denied* 472 U.S. 1007, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985). *See also Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764, *reh'g denied* 473 U.S. 927, 106 S.Ct. 20, 87 L.Ed.2d 698 (1985) and *United States v. Thomas*, 887 F.2d 1341, 1345 (9th Cir.1989).

Case law, where consecutive sentences were not provided, does not present the same duplicate punishment concerns within the double jeopardy prohibition. *See People v. Ratcliffe*, 124 Cal.App.3d 808, 177 Cal.Rptr. 627 (1981).

Likewise, sequentially and severable criminal events for separate crimes are not presented by this case as justification for a double application of statutory sentences. *State v. Washington*, 132 Ariz. 429, 646 P.2d 314 (1982); *State v. Lindsey*, 446 So.2d 1074 (Fla.1984); *State v. Mendonca*, 68 Haw. 280, 711 P.2d 731 (1985); *State v. Hill*, 10 Kan.App.2d 607, 706 P.2d 472 (1985); *State v. Roudybush*, 235 Kan. 834, 686 P.2d 100 (1984); *State v. Dubish*, 234 Kan. 708, 675 P.2d 877 (1984); *Wilson v. Com.*, 695 S.W.2d 854 (Ky.1985); *Hunnicutt v. State*, 755 P.2d 105 (Okl.Cr.1988), to be compared with *State v. Ah Choy*, 780 P.2d 1097 (Hawaii 1989).

Separate victims of criminal conduct are also not presented. *People v. Adams*, 128 Mich.App. 25, 339 N.W.2d 687 (1983). See the comparison of robbery constituting multiple offenses with multiple victims and burglary as only one offense in *State v. Hodges*, 386 N.W.2d 709 (Minn.1986).

E. What *Duffy II does present* in terms of double jeopardy is prosecution of a nonsequential event transactionally limited to one course of behavior. The crime was committed by telephone calls made in advance of any criminal action. There was only one victim in the burglary/robbery crime. The charges filed essentially invoke a lesser included offense to the aggravated robbery. The occurrence progressed from initial burglary as an integrated event with one interest of the criminal. That interest produced a course of events leading to a robbery. Two inchoate offenses were prosecutorially created out of the same action for which consecutive sentences were given to exceed the maximum permitted for any single charged offense.

This case also presents dual crimes charged in a circumstance where a lesser included offense concept is implicated by a burglary occurrence for the purpose of

commission of the aggravated robbery. To be compared are the duplication denied cases, *State v. Bartowsheski*, 661 P.2d 235 (Colo.1983); *State v. Flynn*, 14 Conn.App. 10, 539 A.2d 1005, *cert. denied* — U.S. ——, 109 S.Ct. 226, 102 L.Ed.2d 217 (1988); *Borges v. State*, 415 So.2d 1265 (Fla.1982); *Ah Choy*, 780 P.2d 1097; *Strong v. State*, 538 N.E.2d 924 (Ind.1989); *Carey*, 206 S.E.2d 222 and the singularly important and well considered case of *Corbin v. Hillery*, 74 N.Y.2d 279, 545 N.Y.S.2d 71, 543 N.E.2d 714, *cert. granted* — U.S. ——, 110 S.Ct. 362, 107 L.Ed.2d 349 (1989). *See also Mourad*, 729 F.2d 195.

The federal bank robbery cases are informative by including a concept which prohibits duplicitous charging of incidents of that course of criminal conduct. *United States v. Moore*, 688 F.2d 433 (6th Cir. 1982); *United States v. Lawson*, 683 F.2d 688 (2nd Cir.1982); *United States v. Leek*, 665 F.2d 383 (D.C.Cir.1981); *United States v. Wright*, 661 F.2d 60 (5th Cir.1981).

In this case, the majority agrees that lesser included offenses cannot be used to create a second punishment:

> In later cases, the Supreme Court has held that the same evidence may not be used to sustain multiple offenses in separate proceedings if one was a lesser included offense of the other. *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); *Brown*, 432 U.S. 161 [97 S.Ct. 2221]. The thrust of these later opinions is that a defendant cannot

be subjected to multiple trials for those included and greater offenses even though the offenses are supported by different evidence. The rule of these cases is that no different result is obtained by trying a lesser included offense separately from the greater offense than would ensue if they were tried together.

Unfortunately, the majority decision neither establishes what constitutes the lesser included offense nor explains why the burglary in this case fails to fit. The same problem exists where *Birr*, 744 P.2d 1117 does not fit with *Garcia*, 774 P.2d 623 and *Schultz*, 751 P.2d 367. *See Duncan v. State*, 183 Ga.App. 368, 358 S.E.2d 910 (1987); *Reed v. State*, 778 S.W.2d 313 (Mo. App.1989) and *State v. Tesack*, 383 S.E.2d 54 (W.Va.1989). See generally on lesser included offense, *State v. Jeffries*, 430 N.W.2d 728 (Iowa 1988); *Corbin*, 74 N.Y.2d 279, 545 N.Y.S.2d 71, 543 N.E.2d 714; Blair, *Constitutional Limitations on the Lesser Included Offense Doctrine*, 21 Am.Crim.L.Rev. 445 (1984); and Ettinger, *In Search of a Reasoned Approach to the Lesser Included Offense*, 50 Brooklyn L.Rev. 191 (1984).[18]

What we now do was decried by Justice Jackson in special concurrence in *Krulewitch v. United States*, 336 U.S. 440, 457, 69 S.Ct. 716, 725, 93 L.Ed. 790 (1949):

> There is, of course, strong temptation to relax rigid standards when it seems the only way to sustain convictions of evildoers. But statutes authorize prosecution for substantive crimes for most

**18.** The explicit issue of these double jeopardy cases where the court reaches to approve the division of criminal behavior into separate crimes is whether the court should look at the evidence used or only the charges presented without considering the evidence of what happened. It is not clear that the same analysis is used in comparing cases of successive prosecution with those of duplicate concurrent charging. This difference has, in essential form, an ancient history which is sometimes stated as the elements test or the evidence test, *State v. Yoskowitz*, 116 N.J. 679, 563 A.2d 1 (1989); or the required evidence test compared to the alleged evidence test, Comment, *supra*, 75 Yale L.J. at 271 (citing *King v. Vandercomb & Abbott*, 2 Leach 707, 168 Eng.Rep. 455 (1796)) and compared with *Morey*, 108 Mass. (12 Browne) 433.

In New Jersey, the two tests are alternative and supplies protection to the defendant facing a second prosecution on the same facts. *Blockburger* is considered to provide the element test and the New Jersey court discerned that *Illinois v. Vitale*, 447 U.S. 410, 420, 100 S.Ct. 2260, 2267, 65 L.Ed.2d 228, 238 (1980) re-examined *Blockburger* to produce the evidence test. *Accord* Thomas, *The Prohibition of Successive Prosecutions for the Same Offense: In Search of a Definition*, 71 Iowa L. Rev. 323 (1986) and Comment, *State v. DeLuca: Reinterpreting Double Jeopardy Protection Against Successive Prosecutions*, 41 Rutgers L. Rev. 443 (1988). *See likewise Hambrick v. State*, 256 Ga. 148, 344 S.E.2d 639 (1986).

evil-doing without the dangers to the liberty of the individual and the integrity of the judicial process that are inherent in conspiracy charges. We should disapprove the doctrine of implied or constructive crime in its entirety and in every manifestation. And I think there should be no straining to uphold any conspiracy conviction where prosecution for the substantive offense is adequate and the purpose served by adding the conspiracy charge seems chiefly to get procedural advantages to ease the way to conviction.

Excluding this case with its particularly egregious penal sentence, the factor most recognized in posturing for position in multiplicity crime charge filings is prosecutorial leverage where an adequately extended sentence is normally not a concern in Wyoming within the broad discretion and indeterminate sentence structure provided by the legislature. By this case, the third trip out into the "Sargasso Sea," *Carter*, 714 P.2d 1217, Urbigkit, J., dissenting; *Birr*, 744 P.2d 1117, Urbigkit, J., dissenting, we achieve only a misshapen state constitutional instrument adopted by creating practical problems which are reflected in the thousands of recent criminal cases addressing multiplied criminal responsibility by severable charges.

First, we invoke a legislative intent in each decision without practical factual bases to what was the intent. No coherent framework for analysis is provided as witnessed by *Birr* as the lesser included offense was added in felony murder compared to *Schultz* and *Garcia* where a separately distinguishable offense was adopted for the justified dual sentence, even though in all three cases, it didn't make a particle of difference except for an editorial comment since effective control of the time to be spent for each of the convicted individuals was vested in the governor's office within whose power neither the legislature nor the court can trespass.

The second problem defined in the *Survey of Developments in North Carolina Law, 1986*, 65 N.C.L.Rev. 1121, 1286–87 (1987) (footnotes omitted) is that in entangling courts

"in this Sargasso Sea," the *Hunter* rule effectively gives them a great deal more discretion by allowing the courts to derive the formulas for themselves. A court can, for example, stress a particular factor or look closely at one aspect of the legislative history to reach and buttress its conclusion. There is also much more room for speculation regarding the intent of the legislature now that the courts have no mechanical test to apply. Most significant of all, the decision of a state supreme court on this topic is virtually unreviewable. * * *

A third practical problem is that the rule increases prosecutorial discretion. When the legislature proscribes a certain act in several statutes and permits multiple punishment, the prosecutor gains a great deal of leverage in the plea bargaining process. If five convictions are possible instead of one, it is much easier for a prosecutor to bargain with a defendant by agreeing to drop one or more of the counts brought against the defendant. Because plea bargaining plays such an important role in criminal law, it is possible that prosecutors will want to use this leverage to help secure deals more advantageous to the State. Thus, the *Hunter* rule encourages prosecutors to bring more charges than they intend to prosecute in order to gain a better bargaining position.

In the context of the proper responsibility of the United States Supreme Court to develop the law for future heritage, we fall error to the admonition of Justice Jackson in *Krulewitch*, 336 U.S. 440, 69 S.Ct. 716, of the temptation to sustain conviction as a goal in itself and to forego protecting constitutional rights.

*Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), even in United States constitutional terms, may weave a wavy bright line for its purposes, but I also consider the heritage of the justice delivery system in Wyoming not circumscribed by the United States Supreme Court in voicing its perspective of the United States Constitution. First, it should be noted that *Hunter* is different.

There, the state court found a legislative intent for cumulative punishment which is totally absent here. Otherwise, we reach that supposition by top dressing an uncluttered fact with a presumed intent by *Blockburger* presumption or otherwise.

F. In addressing the constitutional protection against double jeopardy, we need to recognize that two constitutions are involved. The federal double jeopardy clause need not be interpreted identically with our state double jeopardy clause since the state clause was adopted nearly a century later than the United States Constitution.[19]

I find meaning in Professor Keiter's observation that "[d]uring the Wyoming Constitutional Convention debates there were only two references to United States Supreme Court decisions." Keiter, *An Essay on Wyoming Constitutional Interpretation,* XXI Land & Water L.Rev. 527, 543 n. 88 (1986).

Professor Keiter also recognizes:

For several reasons, however, the state courts have wisely begun to reexamine their practice of incorporating federal constitutional doctrine into their own jurisprudence. * * *

The historical circumstances surrounding adoption of the United States Constitution are not remotely similar to the historical circumstances surrounding adoption of many states' constitutions, particularly those like Wyoming that were adopted long after the colonial era had ended. It therefore makes no sense to incorporate an interpretation attributable to the original framers of the federal Constitution into a state's own constitutional jurisprudence. Similarly, in the absence of an indication that a state's constitutional framers looked to Supreme Court precedent in framing a provision, there is no reason to assume that Supreme Court doctrine influenced them during their deliberations.

*Id.* at 543 (footnotes omitted).

I am not confined to abject reliance on the borrowed interpretative model for Wyo-

ming constitutional implementation. To secure effective guidance is to require consistent direction. Serious scholarship suggests we should more adequately rely on state court decisions to interpret our state constitution and not on the changeability of federal adaptations manifested by confusing and denying constitutional rights. Witness need only be taken in the trend lines and variances found in those cases. Commencing with *Ex parte Lange,* 85 U.S. 163, we need only follow *Ebeling v. Morgan,* 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915); *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952); *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405, *reh'g denied* 358 U.S. 858, 79 S.Ct. 13, 3 L.Ed.2d 92 (1958); *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *Hunter,* 459 U.S. 359, 103 S.Ct. 673; and most recently, *United States v. Broce,* 488 U.S. 563, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989) to ascertain how little we can establish as a permanent, consistent enforcement of this constitutional right prohibiting double jeopardy which, in history, predates the United States Constitution by at least 500 years and probably had its initiation in Roman and Grecian law more than a millennium earlier.

Furthermore, we are even informed how thin the waiver veneer can be. See also the recognition "that the 'waiver' rationale is a 'conceptual abstraction' which obscures rather than illuminates the underlying clash of societal and individual interests." *Benton v. Maryland,* 395 U.S. 784, 812, 89 S.Ct. 2056, 2071, 23 L.Ed.2d 707 (1969), Harlan, J., dissenting. *See also United States v. Tateo,* 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964), where Justice Harlan wrote the opinion for the court, and its

---

**19.** "Nor shall any person be twice put in jeopardy for the same offense." Wyo. Const. art. 1, § 11. "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb; * * *." U.S. Const. amend. V.

predecessor, *Ball v. United States*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). The literature is extensive, but among the scholarly reviews one can find thought and persuasion in Pote, *A Closer Look at the Supreme Court and the Double Jeopardy Clause*, 49 Ohio St. L.J. 799 (1988); Thomas, *Multiple Punishments for the Same Offense: The Analysis After Missouri v. Hunter or Don Quixote, The Sargasso Sea and the Gordian Knot*, 62 Wash.U.L.Q. 79 (1985); Comment, *supra*, 75 Yale L.J. 262; Note, *Criminal Procedure—Consecutive Sentences For Felony Murder and the Underlying Felony: Double Jeopardy or Legislative Intent? Birr v. State*, 744 P.2d 1117 (Wyo.1987), XXIII Land & Water L.Rev. 603 (1988); and Survey, *supra*, 65 N.C.L.Rev. 1121.

G. Representative cases can be found in abundance where the state courts have drawn the line against fracturing a criminal transaction into too many crimes. One of the more attentive courts is illustrated by *Hunnicutt*, 755 P.2d at 109–110 (emphasis in original):

> The fifth amendment guarantee against double jeopardy protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). Courts have generally used two tests in deciding whether a conviction violates the multiple punishment component of the double jeopardy prohibition. Under the "same evidence test," the question to ask is "whether each of the offenses charged requires proof of an additional fact that is not necessary to the other." *Johnson v. State*, 611 P.2d 1137, 1140 (Okla.Crim. App.1980), *cert. denied* 449 U.S. 1132, 101 S.Ct. 955, 67 L.Ed.2d 120 (1981), *rehearing denied*, 450 U.S. 1026, 101 S.Ct. 1734, 68 L.Ed.2d 221 (1981). Therefore, an act can violate more than one statute if each statute requires proof of an additional fact that the other does not, and multiple punishments are not prohibited, even though each offense may arise from the same act or criminal episode. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Under the "same transaction test," one must determine "whether the offenses charged were parts of the same criminal act, occurrence, episode or transaction" and, if so, multiple punishments should be barred by the double jeopardy clause. *Johnson*, 611 P.2d at 1141.

When the pros and cons of each test were considered in *Johnson*, it was noted that just "because we treat the double jeopardy issue in one case by using one test [does not mean that] this Court will not apply the other test in appropriate cases." *Id.* at 1144. The Court made clear its purpose when it said:

> [W]e merely follow the collective wisdom of this Court's prior decisions and elect the course which allows this Court to utilize the necessary tools to accomplish the task before it. In taking this course, we do nothing more than elevate the distinct purposes of the Double Jeopardy Doctrine to the equal dignity and reverence each [test] deserves.

*Id.* Based on the foregoing, we examine appellant's situation to determine which test best serves the underlying purposes of the double jeopardy prohibition against multiple punishments for the same offense.

\* \* \* \* \* \*

\* \* \* The question remains, however, whether appellant can be convicted of *two* counts of *one* offense arising out of the *same* transaction. The answer depends on whether one determines that the "criminal episode involves separate and distinct offenses, consisting of different elements or dissimilar proof." *Weatherly v. State*, 733 P.2d 1331, 1336 (Okla.Crim.App.1987). \* \* \* Offenses are distinct and separate if they "are not mere means to some other ultimate objective, nor are they offenses included in some other offense, nor are they merely different incidents or facets of some primary offense." *Weatherly*, 733 P.2d at 1336–37 (citing *Clay v. State*, 593 P.2d 509, 510 (Okla.Crim.App.1979)).

In interesting conclusion, the court stated:

> [A] prosecutor cannot stack multiple charges in situations such as this, to

"offer[] the jury a choice—a situation which is apt to induce a doubtful jury to find the defendant guilty of the less serious offense rather than to continue the debate as to his innocence. *Cichos v. Indiana*, 385 U.S. 76, 81, 87 S.Ct. 271, 273, 17 L.Ed.2d 175 (1966) (Fortas, J., dissenting from dismissal of certiorari). *Id.* at 111.

Other cases include *State v. Eppler*, 362 N.W.2d 315 (Minn.1985), multi-item shoplifting is one criminal offense and *Hodges*, 386 N.W.2d 709, burglarious entry of one dwelling justifies only one burglary conviction where the three persons were present in the house, which incidentally did not affect his 238 month sentence for felony murder where no consecutive sentences were given. The Michigan court in *Adams*, 339 N.W.2d at 689 deleted one of the two convictions for possession of a firearm during the commission of a felony. Also looking at the facts of the occurrence, conviction for both burning a dwelling and arson of insured property was reversed for the second concurrent sentence in *People v. Kedziora*, 125 Mich.App. 150, 336 N.W.2d 460 (1983) by concluding the criminal could not be guilty of burning insured property without committing arson.

For the fatal beating of a child, the defendant was convicted and sentenced for murder, involuntary manslaughter, reckless homicide, battery, child neglect and criminal confinement in *Strong*, 538 N.E.2d 924. The court related that only one killing and only one sentence could be imposed for the killing and reversed all convictions except murder and criminal confinement. The exceptionally detailed case of *Corbin*, 74 N.Y.2d 279, 545 N.Y.S.2d 71, 543 N.E.2d 714 considered successive prosecutions of driving while under the influence and vehicular homicide with double jeopardy applied to deny the successive prosecutions. *Cf. Nowack v. State*, 774 P.2d 561 (Wyo.1989).

A three count conviction of theft, attempted theft and entering a vehicle with intent to commit theft was reduced by application of offense inclusion to one charge in *Carter v. State*, 162 Ga.App. 44, 290 S.E.2d 143 (1982). See likewise *Tompkins*

*v. McMickle*, 172 Ga.App. 62, 321 S.E.2d 797 (1984), aggravated assault merged into attempted armed robbery. The court applied alternative tests for dual sentence preclusion by both an analysis of the facts presented (factual review) and the charges presented as a matter of law (legal review). *Hambrick v. State*, 256 Ga. 148, 344 S.E.2d 639 (1986). *Carey*, 206 S.E.2d 222 presented the included felony of armed robbery merged into the felony murder crime, but the conspiracy charge remained a viable additional charge.

By statutory provision, the transaction rule was abrogated expressly in Florida, but the statute retained the exclusion of lesser included offense. *Borges*, 415 So.2d 1265. These principles were then addressed in *Lindsey v. State*, 416 So.2d 471, 472 (Fla.App.1982), *rev'd on other grounds, but otherwise affirmed on this issue*, 446 So.2d 1074 (Fla.App.1984) of "how many ways a single criminal episode may be carved up to sustain separate crimes and sentences * * *." The court authenticated a sentence of burglary, robbery and false imprisonment. *See also Lindsey*, 446 So.2d 1074. Those decisions were followed by *Carawan v. State*, 515 So.2d 161 (Fla.1987), which considered dual convictions of aggravated battery and attempted manslaughter. The Florida constitutional clause of double jeopardy is identical to that of Wyoming. The court recognized that the power to define offenses and punishment was in the legislature.

> "The argument seems to us irresistible, and we do not doubt that the Constitution was designed as much to prevent the criminal from being twice punished for the same offence as from being twice tried for it."
>
> Indeed, the prohibition against double jeopardy was aimed as much at the evil of multiple punishments for single offenses as at the evil of retrial for the same offense.

*Id.* at 164 (quoting *Ex parte Lange*, 85 U.S. at 173 and citing Note, *A Definition of Punishment for Implementing the Double Jeopardy Clause's Multiple–Punish-*

*ment Prohibition,* 90 Yale L.J. 632, 635 n. 16 (1981)).

The court further recognized:

At the same, however, we recognize that the power to define crimes and punishments in derogation of the common law inheres in the legislative branch, * * *, subject to constitutional imitations. It is presumed, however, that this legislative prerogative is not exercised by punishing the same offense under more than one statutory provision, since the legislature can achieve the same result with greater economy by merely increasing the penalty for the single underlying offense. Thus, before reaching the question of any possible constitutional violation, courts necessary must first determine what the legislature intended to punish and precisely how.

*Carawan,* 515 So.2d at 164. The court addressed three main rules of statutory construction for application:

The first is that absent a violation of constitutional right, specific, clear and precise statements of legislative intent control regarding intended penalties. * * *

The second rule is that, in the absence of any clearly discernible legislative intent, the court begins by using the test established in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to assist in determining this intent. * * * Simply stated, the *Blockburger* test compares the elements of the crimes in question. * * *

The third rule is that courts must resolve all doubts in favor of lenity toward the accused.

*Id.* at 165. Lenity is described as " 'a fundamental rule of statutory construction, i.e., that criminal statutes shall be construed strictly in favor of the person against whom a penalty is to be imposed.' " *Id.* at 166 (quoting *Palmer v. State,* 438 So.2d 1, 3 (Fla.1983)). The court then recognized:

At the outset, we conclude that the preeminence of legislative intent means

that *Blockburger* necessarily is only the first step in the court's analysis. Although *Blockburger* creates a presumption as to the actual legislative intent, it is not a blind presumption that may be applied without regard to other relevant evidence of the true intent. It would be absurd indeed to apply *Blockburger,* which was meant to help determine legislative intent, in a way that actually defeats what reason and logic dictate to be the intent. As has been noted, an exclusive *Blockburger* analysis sometimes leads to a result contrary to common sense. * * *

We find that unreasonable results sometimes may be achieved by applying no rule of construction other than *Blockburger* to determine the intent behind a facially ambiguous penal statute. As our courts frequently have noted, the true intent may be discerned in the circumstances and documentation accompanying a law's enactment, it's evidence purpose, the particular evil it seeks to remedy, the fact that it seeks to protect a particular class or remedy a special problem, or other relevant factors. * * * Accordingly, after first applying the *Blockburger* test, the court then must consider the presumption so created in light of any relevant factors that may indicate a contrary legislative intent.

*Carawan,* 515 So.2d at 167 (footnote omitted). The court further notes "where there is a basis for concluding that the legislature intended a result contrary to that achieved by the *Blockburger* test, a conflict arises that requires resort to the third rule of construction applicable to this problem, the rule of lenity." *Id.* at 168. In this regard, Florida's lenity requirement constituted a rule of construction coequal to *Blockburger* with both provisions related in purpose since both provide guidelines for the construction of ambiguous statutes. After considering past precedent, the court then found that attempted manslaughter and aggravated battery address the same evil which was predicated upon one single underlying act.[20] The case was remanded

---

**20.** The Florida court in *Carawan,* 515 So.2d at 170 n. 8 (emphasis in original) said "our holding

to vacate either the manslaughter or aggravated battery conviction. *See likewise Meadows v. State*, 534 So.2d 1233 (Fla.App. 1988) and *State v. Smith*, 245 Kan. 381, 781 P.2d 666 (1989), aggravated battery and first degree murder.

In *Flynn*, 539 A.2d 1005, interference with a police officer was found to be a lesser included offense of assault on a police officer and, consequently, more than one conviction offended the constitutional prohibition against double jeopardy. However, the third count conviction in the case of reckless endangerment did not.

The test for California cases is whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the California statutory scheme to be determined by the intent and objectives of the actor, which is at least a part, albeit expanded, of the lesser included offense principle. In the case of *Neal v. State*, 55 Cal.2d 11, 9 Cal.Rptr. 607, 357 P.2d 839 (1960), *cert. denied* 365 U.S. 823, 81 S.Ct. 708, 5 L.Ed.2d 700 (1961), dual attempted murder constituted two offenses in the arson occurrence. The arson, however, when included with those two offenses and tested on appellate review by habeas corpus as an issue not raised on initial appeal, constituted a jurisdictional decision. The arson conviction was deleted. The same decisional process followed in *People v. Bauer*, 1 Cal.3d 368, 82 Cal.Rptr. 357, 461 P.2d 637 (1969), *cert. denied* 400 U.S. 927, 91 S.Ct. 190, 27 L.Ed.2d 187 (1970), where the defendant was convicted of burglary, robbery, grand theft and auto theft. Intent and objective as constituents of an indivisible transaction applied to offenses of robbery and auto theft foreclosed any dual sentence. The prior car theft burglary case of *People v. Churchill*, 255 Cal. App.2d 448, 63 Cal.Rptr. 312 (1967) was disapproved. *Ratcliffe*, 124 Cal.App.3d 808, 177 Cal.Rptr. 627 continued the examination of the intent and objective of the perpetrator to be applied to false imprisonment and kidnapping to establish a test to delivery whether separate punishment could be provided.

The Kentucky court in *Gilbert v. Com.*, 637 S.W.2d 632 (Ky.1982), *cert. denied* 459 U.S. 1149, 103 S.Ct. 794, 74 L.Ed.2d 998 (1983) considered convictions of attempted kidnapping, first degree wanton endangerment and first degree robbery of one female victim and rape and the kidnapping and robbery of another female. Possession and use of a pistol was not an offense separate from first degree robbery and, with the event of robbery close in distance and brief in time, required reversal of wanton endangerment and attempted kidnapping of one victim. In *Wilson*, 695 S.W.2d 854, a sequential application of the proof necessary to demonstrate the statutory elements of each offense permitted dual conviction of robbery and assault where the shooting occurred after the robbery had been completed. *Polk v. Com.*, 679 S.W.2d 231 (Ky.1984).

Aggravated assault and armed robbery provided the same result in *Washington*, 646 P.2d 314 where the shot was fired after the robbery had been completed as a sequential event. An earlier shot was denied as a basis for assault as too intertwined with the elements of armed robbery. The rule for *Washington* in determination of statutory intent to define a single crime which may be committed by different means or to define two crimes stated:

> "[T]here may be many factors that will aid the court, such as [1] title of the act; [2] whether there is a readily perceivable connection between the various acts set forth; [3] whether the acts are consistent with and not repugnant to each other; [4] and whether the acts may inhere in the same transaction."

*State v. Arndt*, 87 Wash.2d 374, 553 P.2d 1328, 1331 (1976) (quoting *State v. Kosanke*, 23 Wash.2d 211, 213, 160 P.2d 541, 542 (1945)).

Conduct of an egregiously bad husband and his array of convictions were addressed in *Dubish*, 675 P.2d 877, where the

applies only to separate punishments arising from one *act*, not to one *transaction*. An act is a discrete event arising from a single criminal intent, whereas a transaction is a related series of acts."

man was convicted of inflicting aggravated kidnapping, aggravated sodomy, aggravated battery and making a terrorist threat against his wife. Multiplicity was considered as the danger of receiving more than one sentence for one offense in review, and it was recognized "[t]he State may not split a single offense into separate parts. Where there is a single wrongful act it generally will not furnish the basis for more than one criminal prosecution." *Id.* at 880. The sequential and geographically separated events justified three separate convictions. The sodomy offense was set aside for other reasons. *Roudybush,* 686 P.2d 100 followed with the separate and severable examination, different time and different place or different marijuana, which was the test applied. *See Smith,* 781 P.2d 666. *Taylor v. State,* 710 P.2d 1019 (Alaska App.1985) revealed the childrens' non-support crime could not be segmented for separate convictions. Stacking was again rejected in *Hunnicutt,* 755 P.2d 105 for four offenses of selling two pistols. *See State v. Fox,* 98 Or.App. 356, 779 P.2d 197 (1989), where attempted murder and attempted assault merge with attempted aggravated felony murder and only a single judgment of conviction was proper under the thesis of double jeopardy preclusion.

Within the waves of case law which beat upon the subject in current adjudication, perhaps the most thoughtful analysis was provided by Justice Exum of the North Carolina Supreme Court in his dissent in *State v. Gardner,* 315 N.C. 444, 340 S.E.2d 701, 714 (1986) which, in my perspective, identifies the environment even though the case does not specifically tell whether maximum consecutive sentences were provided:

> I concede that under *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution does not preclude punishing this defendant for both felonious breaking or entering and felonious larceny, of which, we must assume, the breaking or entering is an essential element, so long as our legislature so intended.

> I think *Hunter* was incorrectly decided. It is based, in my view, on a misapplication of principles formulated by the United States Supreme Court in earlier cases and designed to resolve double jeopardy questions other than the one presented here and in *Hunter.* The misapplication is understandable because as the Supreme Court itself acknowledged in *Albernaz v. United States,* 450 U.S. 333, 343, 101 S.Ct. 1137, 1144–45, 67 L.Ed.2d 275, 284 (1981), its "decisional law in the [double jeopardy] area is a veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator." Now a majority of our Court has, by slavishly following *Hunter* and misapplying some of the same precedents there relied on, determined to entangle itself in this Sargasso Sea even after being forewarned by the Court which created it and decided *Hunter* based upon it. Forewarned, for the majority, is not, alas, to be forearmed.

> I concede, of course, that we are bound by *Hunter* insofar as we must decide this case under the Double Jeopardy clause of the Fifth Amendment. We are not bound to follow *Hunter* and are free to follow our own precedents on the subject insofar as we base decision on the double jeopardy prohibition contained in the * * * North Carolina Constitution.

The concern expressed by Justice Exum reflects the determined view for Wyoming enunciated by Justice Blume sixty-six years ago in *Tobin,* 31 Wyo. at 368, 226 P. 681, where the transactional understanding of criminal responsibility was identified:

> "[T]he several acts are considered as so many steps or stages in the same affair, and the offender may be indicted as for one combined act in violation of law; and the proof of either of the acts mentioned in the statute and set forth in the indictment will sustain a conviction."

It is completely unjustified to now deny that wisdom by "finding" in what was not and, in the following cases, "reconstructing" what never existed. Without application of a characterization of preciseness of reasoning, what had really happened in

Wyoming's early criminal law history limited the prosecution to one charge for one course of events where there was only one victim. *Jerskey v. State,* 546 P.2d 173 (Wyo.1976); *Dycus v. State,* 529 P.2d 979 (Wyo.1974); *Boyd v. State,* 528 P.2d 287 (Wyo.1974), *cert. denied* 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102 (1975); *Jackson v. State,* 522 P.2d 1286 (Wyo.1974); *Dorador v. State,* 520 P.2d 230 (Wyo.1974); *Loddy v. State,* 502 P.2d 194 (Wyo.1972), *cert. denied* 414 U.S. 1134, 94 S.Ct. 877, 38 L.Ed.2d 760 (1974).

Acceptance of the differentiated questions of successive prosecution driving under the influence and felony homicide elicited in *Nowack,* 774 P.2d 561; see, however, *Corbin,* 543 N.E.2d 714, does not take me to a contrary persuasion. Neither do I find the felony murder dual sentence persuasive where the court adopted a very restricted minority position. *Birr,* 744 P.2d 1117, Urbigkit, J., dissenting. *Cf. Lauthern v. State,* 769 P.2d 350 (Wyo.1989); *Gardner,* 340 S.E.2d 701; and Note, *supra,* XXIII Land & Water L.Rev. 603. Finally, this court just continues to be wrong in permitting the use of lesser included offense for dual punishment. *Lauthern,* 769 P.2d 350.

Rephrased in early terms from our heritage in ruling case law, we find stated in *People v. Cook,* 236 Mich. 333, 210 N.W. 296, 296-97 (1926) (quoting 8 R.C.L. 143):

"Stated in another form, if there was one act, one intent, and one volition, and the defendant has been tried on a charge based on such act, intent, and volition, no subsequent charge can be based thereon, though the crimes involved in the two proceedings are entirely different."

\* \* \* \* \* \*

The rule is general that, where one offense is a necessary element in, and constitutes part of, another, and both are in fact on transaction, an acquittal or conviction of one should bar the prosecution for the other.

It is obvious that the offenses charged in the two informations are one and the same, and in fact here constitute one transaction; that, under facts undisputed, one is a necessary element in, and a part of the other, and an acquittal or conviction of one bars the prosecution of the other.

Particularizing a difference in *Cook* was involvement of successive prosecutions, although the case remained as a basic premise in constitutional law for double jeopardy.

The principle was similarly addressed by the Supreme Court of Washington in *Arndt,* 553 P.2d at 1334 (quoting *Com. v. Colonial Stores, Inc.,* 350 S.W.2d 465, 467 (Ky.1961)):

"Doubts in the construction of a penal statute will be resolved in favor of lenity and against a construction that would produce extremely harsh or incongruous results or impose punishments totally disproportionate to the gravity of the offense; so in case of ambiguity the construction will be against turning a single transaction into multiple offenses."

We have no actual evidence here in *Duffy II* that the legislature intended the initial burglary to be punished in addition to the robbery. This lack of intent to double up is strengthened where the same aggravating factor can be applied to burglary as to robbery and where applied to achieve the identical scope of punishment. *See* W.S. 6-2-401, larceny with force or injury as aggravated robbery as compared with larceny with force or injury while involved in the burglary, W.S. 6-3-302. In each case, we have the same elements, force or injury, the connective offense and statutory punishment provided not less than five years nor more than twenty-five years. In Wyoming, life or death sentences are almost the only cases where ordered confinement exceeds twenty-five years.[21] Any change

---

21. The court should judicially notice records of the meeting of the interim sessions of the legislative judiciary committee with the primary purpose in that adaptation of the newer criminal code, Wyo. Sess. Laws ch. 171 (1983); Wyo. Sess. Laws ch. 75 (1982); to realistically relate offense of equal significance to have prosecutorial ranges within similar amounts. As a result, the only offenses for which a punishment in excess of twenty-five years is now provided is murder, W.S. 6-2-101, death or life; second degree murder, W.S. 6-2-104, twenty years to

should be made by the legislature and not by prosecutorial and judicial ingenuity.

## VI. WHAT DOES DUFFY II STAND FOR?

*An indiscriminate and indeterminate net is created lacking certainty whether woven to catch whales or minnows. If the justice delivery function of the double jeopardy intent case law is to recognize the right of the legislature to establish prohibited criminal conduct, that rationality and consistency must be applied to Blockburger elements and evidence as well as concurrent and successive trials. There are two ways to increase the detriment to be assessed for conviction of criminal conduct. The first is to statutorily, judicially, or administratively increase confinement time. The second is to divide up the criminal behavior into separately punishable crimes. The first is a legitimate exercise of society's decision. The second attacks the basic constitutional interest long followed with its accommodative ancient history prohibiting double jeopardy. Unfortunately, the constitutional interest is disregarded when the mindlessness of today intermixes both. In first approach, decision and discretion are examined by the legislature and the judiciary. Operationally, the second "answer" accomplishes a proven delegation to the prosecution as the result to be achieved. In the real world within the criminal justice delivery system, this is called leverage.*

Among the multitude of inconsistent pathways chosen to segregate the violated

double jeopardy right from responsibility for actual commission of more than one offense, I would find the double jeopardy application of the New Jersey court in *State v. Yoskowitz*, 116 N.J. 679, 563 A.2d 1 (1989) an alternative application of the elements on the evidence test to have most narrowly achieved a determinably consistent and essentially validated result. *See likewise State v. Moore*, 109 N.M. 119, 782 P.2d 91, 99, *cert. denied* 109 N.M. 54, 781 P.2d 782 (1989).

## VII. CONCLUSION

In principle, I disagree with the majority because a presumptive concept is applied to produce an absurd result. In historical concern, I differ because, with the legitimate and liberal creation of new crimes in the recent past by legislative enactment, we now add offense multiplication for prosecution to eliminate completely the legislative principle of similar punishment for identical offenses. The attitude of anything goes as a principle of criminal law administration is unacceptable.[22] The legislature by statute and not the prosecution by duplicate charges should establish the maximum punishment for criminal conduct. As a society, we should return to the basic understanding of our fundamental constitutional concepts. In this case, it is the preclusion of double jeopardy.

Consequently, for *Duffy II*, I again dissent.

---

life; kidnapping with physical harm, W.S. 6–2–201, twenty years to life; and sexual assault in the first degree, W.S. 6–2–306, five to fifty years. In next level of punishment, aggravated robbery, W.S. 6–2–401 and aggravated burglary, W.S. 6–3–301, comprise the only sentences reaching the twenty-five year maximum. Clearly, the ingenuity of the prosecutors and the acceptance by the courts are more effective than was the prescience of the legislature in trying to develop a rational, yet realistic, sentencing system. A history for legislative intent interpretation can be developed from actual events, even with the minimal records maintained within the Wyoming legislative processes.

**22.** A reason for alarm is that in the face of signs of negation once again "one can't avoid thinking that perhaps there is a sad parallel between [the post-Civil War period] and now: Is the curve of events, this time, to retrace that which followed the Civil War?"

\* \* \* \* \* \*

If we do stand at the threshold of a time that "will usher in a new and savage struggle between freedom's believers and its destroyers," the ultimate outcome may well depend on the response of the judiciaries of the states. Brennan, *The Fourteenth Amendment,* 25 Trial 24, 28 (1989) (footnotes omitted and quoting The Fourteenth Amendment, Centennial Volume, at 112, 114 (B. Schwartz ed. 1970)).